UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Present: The Honorable     JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE PLAINTIFFS' MOTION TO EXCLUDE REPORTS AND TESTIMONY OF DEFENDANTS' EXPERT DEREK A. OTT, M.D., M.A. (DKT. 148); DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND WRITTEN REPORT OF PLAINTIFFS' EXPERT, JASON C. TRAVERS, PH.D. (DKT. 152, 166); DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION (DKT. 157)**

## I.    Introduction

J.V., a minor ("J.V."), through his guardian ad litem and mother Anabel Franco ("Franco") and B.K., a minor ("B.K.")[1] through his guardian ad litem and mother Cynthia Brown ("Brown") (J.V. and B.K. together, "Plaintiffs") brought this putative class action on behalf of themselves and all other similarly situated students. Complaint, Dkt. 1. On November 10, 2016, Plaintiffs filed their Second Amended Complaint ("SAC"), Dkt. 128. It advances nine causes of action against Pomona Unified School District ("District"), Pomona Special Education Local Planning Area ("SELPA"), Ana Petro ("Petro"), Christine Goens ("Goens"), Kameron Shields ("Shields"), Beatriz Krivan ("Krivan"), Jennifer Yales ("Yales"), Selene Amancio ("Amancio"), Brian El Mahmoud ("El Mahmoud"), Daniella Soto ("Soto"), Mary Garcia ("Garcia"), Cindy Green ("Green"), Elaine Markofski ("Markofski"), Superintendent Richard Martinez in his official capacity only ("Martinez") and Dolores Murillo ("Murillo"). *Id.*[2]

The SAC advances nine causes of action: (i) violation of Title II of the Americans with Disabilities Act of 1990 ("Title II"), 42 U.S.C. §§ 12101 *et seq.*; (ii) violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794, *et seq.*; (iii) violation of 42 U.S.C. § 1983 (4th Amendment); (iv) False Imprisonment; (v) Battery; (vi) Assault; (vii) Intentional Infliction of Emotional Distress; (viii) Negligent Supervision; and (xiii) Negligence. *Id.* Plaintiffs, who are minor students receiving special education

---

[1]  Both minors are referred to by their respective initials in recognition of their rights to privacy.
[2]  All defendants except Petro are represented by the same counsel and are referred to as "Defendants" in this Order. Petro, who is represented by other counsel, is referred to as "Petro." This protocol has been adopted for ease of reference in light of the matters discussed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

services, claim that Defendants and Petro abused them beginning in August 2013, and that Defendants failed adequately to document this abuse, report this abuse and to take reasonable steps to prevent further abuse.

On March 10, 2017, Plaintiffs brought a Motion to Exclude Reports and Testimony of Defendants' Expert Derek A. Ott, M.D., M.A. ("Motion to Exclude Ott"). Dkt. 148. Defendants filed an opposition ("Opposition to Motion to Exclude Ott"). Dkt. 171. Petro did as well ("Petro Opposition to Motion to Exclude Ott"). Dkt. 170. Plaintiffs replied to both in a single memorandum ("Reply to Motion to Exclude Ott"). Dkt. 176.

Also on March 10, 2017, Defendants brought a Motion to Exclude the Testimony and Written Report of Plaintiffs' Expert, Jason C. Travers, Ph.D. ("Motion to Exclude Travers"). Dkt. 152. On March 13, 2013, Petro joined in the Motion to Exclude Travers. Dkt. 166. Plaintiffs opposed. ("Opposition to Motion to Exclude Travers"). Dkt. 169. Defendants replied ("Reply to Motion to Exclude Travers"). Dkt. 177. Petro did as well ("Petro Reply to Motion to Exclude Travers"). Dkt. 175.

Defendants also moved for partial summary judgment ("Motion for Partial Summary Judgment"). Dkt. 157.[3] Plaintiffs opposed ("Opposition to Motion for Partial Summary Judgment"). Dkt. 173. Defendants replied ("Reply to Motion for Partial Summary Judgment"). Dkt. 179.

A hearing on the Motion to Exclude Ott, Motion to Exclude Travers, and Motion for Partial Summary Judgment was held on April 17, 2017. The Court stated its tentative views it would deny the Motion to Exclude Ott, grant the Motion to Exclude Travers and grant in part the Motion for Partial Summary Judgment. Counsel for both parties addressed the Court, and the Motions were taken under submission. Dkt. 198.

For the reasons stated in this Order, the Motion to Exclude Ott is **DENIED**, the Motion to Exclude Travers is **GRANTED**, and the Motion for Partial Summary Judgment is **GRANTED IN PART**.

## II. Factual Background

### A. District-Wide Policy and Procedure[4]

---

[3] The Motion for Partial Summary Judgment is captioned "Motion for Summary Adjudication." A motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 is the federal court analogue to the process for summary adjudication under Cal. Code. Civ. Proc. §437c(f). Therefore, Defendants' motion is construed as one for partial summary judgment.

[4] Plaintiffs have requested judicial notice of the following documents:
- **Ex. A**: Office of Administrative Hearings, State of California, OAH Case No. 2014060963.
- **Ex. B**: Office of Administrative Hearings, State of California, OAH Case No. 2014061022.
- **Ex. C**: Office of Administrative Hearings, State of California, OAH Case No. 2014100324.
- **Ex. D**: Pomona Unified School District, Superintendent's Office, http://www.edlinesites.net/pages/PUSD/Departments/Superintendent, last visited March 24, 2017).
- **Ex. E**: Pomona Unified School District, Board Policies, http://www.boarddocs.com/ca/pomona/Board.nsf/Public#, last visited March 27, 2017).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

1.    Special Education Policies

The District has between 390 and 400 students who have symptoms of autism. Ex. 31 to Declaration of Christine Scheuneman ("Scheuneman Decl."), Dkt. 173-64 at 7 (30(b)(6) Deposition of Jennifer Yales ("Yales 30(b)(6) Depo.")). Students who may be eligible for special education are given a series of assessments, and classified according to 13 areas, one of which applies to those with autistic-like symptoms. *Id.* 7-8. In the next step of the process, students are provided with an Individualized Education Plan ("IEP") that provides for placement. *Id.* There are 18 classes within the District for autistic-like students. *Id.* at 9.

The District's Special Education Procedural Handbook includes a section titled "Positive Behavior Intervention Supports." Ex. C to Declaration of Jennifer Yales ("Yales Decl."), Dkt. 161-3 at 2. It provides that "[w]hen a student's behavior is found to be significantly impacting progress, a behavior teaching/intervention plan must be developed as part of the IEP process." *Id.* It also provides:

> In the event that the behavior presents itself as "serious" or when previous attempts to remedy the behavior have not been proved [sic] successful, a Functional Behavioral Assessment (FBA) should be considered. Likewise, "serious" behaviors (CCR Title 5 3001. (c)) must be reported to the special education department and SELPA by filling out the "Behavioral Emergency Report." Functional Analysis Assessments (FAA) must be considered when a "serious" behavior emergency has occurred and environmental changes are being considered. Finally, ongoing Crisis Prevention Intervention trainings are offered to those staff working with special education students in order appropriately respond to situations/serious behavior problems.

*Id.* at 2.

The handbook states that "only approved emergency interventions may be implemented" for special education students. *Id.* at 5. The only approved intervention in the District is Nonviolent Crisis Prevention Intervention ("NCPI"). *Id.* The following restrictions on NCPI have been in place at all relevant times:

> Emergency interventions are to be employed only when the following occurs:
> - the acting out individual is at risk for harm to self or others, and
> - other intervention techniques are not resulting in stopping the behavior

---

Plaintiffs' Request for Judicial Notice, Dkt. 173-6. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Courts "may take judicial notice of records and reports of administrative bodies." *Interstate Nat. Gas Co. v. S. California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953). Further, "[c]ourts may take judicial notice of the fact that an internet article is available to the public, but it may not take judicial notice of the truth of the matters asserted in the article." *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 762 (C.D. Cal. 2015). Applying these standards, judicial notice is granted as to the OAH opinions and District websites, but not to the truth of the matters asserted within such materials.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Emergency interventions MAY NOT include:
- locked seclusion
- use of a devise or material which simultaneously immobilizes all four extremities except that techniques such as prone containment may be utilized by staff trained in that procedure (cannot cause pain or trauma)
- or that exceeds that which is reasonable and necessary under the circumstances.

*Id.* at 6.

Whenever NCPI is used, a Behavior Emergency Report must be completed that day. *Id.* The documentation is provided to the special education department. Ex. 4 to Scheuneman Decl., Dkt. 173-38 at 17-18 (Deposition of Selene Amancio ("Amancio Depo.")). The school principal has a role in ensuring that the appropriate paperwork is completed, but the primary responsibility for that oversight is placed with others. *Id.* at 20. In addition, the school is required to contact a student's IEP team within one or two days after the incident that prompted a Behavioral Emergency Report. Ex. 31 to Scheuneman Decl., Dkt. 173-64 at 10 (Yales 30(b)(6) Depo.). The school is also to notify the student's family. *Id.*

Green, who was the Special Education Coordinator for the District during the relevant time period, was responsible for oversight of the NCPI program. Ex. 8 to Scheuneman Decl., Dkt. 173-41 at 8 (Deposition of Cindy Green ("Green Depo.")). She gathered information about who attended trainings based on sign-in sheets. *Id.* at 11. Training was "highly recommended," but not mandatory. *Id.* at 14. Special education staff were "invited" to NCPI trainings on a two-year rotation. Ex. 23 to Scheuneman Decl., Dkt. 173-56 at 28-29 (30(b)(6) Deposition of Cindy Green ("Green 30(b)(6) Depo.")). Trainings were held approximately twice each month. *Id.* at 28.

Green testified that the District required a Behavior Emergency Report when an NCPI hold or restraint was used on a student. Ex. 8 to Scheuneman Decl., Dkt. 173-40 at 22 (Green Depo.). She stated that she was not certain the process that would apply if a non-NCPI restraint or hold were used. *Id.* at 23.

Until 2013, the District was required to send data on Behavior Emergency Reports to California, which would compile the data. Ex. 23 to Scheuneman Decl., Dkt. 173-56 at 23 (Green 30(b)(6) Depo.). After that requirement was eliminated, there was a gap before the District developed its own protocol on such reports. *Id.*

Yales, the Director of SELPA and of Special Education for the District, testified that NCPI training is a part of the new-hire training provided to teachers and aides. But, she also testified that there was no specific requirement that they attend every day of training before beginning as teachers. Ex. 12 to Scheuneman Decl., Dkt. 173-45 at 13 (Deposition of Jennifer Yales ("Yales Depo.")). Aides hired before the 2016-17 school year were not provided with NCPI training before they started work. *Id.* at 15.

2.    <u>Reporting and Oversight</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Yales testified that the principal of a school is the primary evaluator of classroom teachers, including special education teachers, within that school. Ex. 12 to Scheuneman Decl., Dkt. 173-45 at 10-11 (Yales Depo.). The principal can ask the special education administrator to co-evaluate teachers. *Id.* at 11.

Classroom teachers do not directly supervise aides. Ex. 15 to Scheuneman Decl., Dkt. 173-48 at 20 (Deposition of Dolores Murillo ("Murillo Depo.")); *see also* Ex. 30 to Scheuneman Decl., Dkt. 173-63 at 7 (30(b)(6) Deposition of Kameron Shields ("Shields 30(b)(6) Depo.")). Murillo, who was a classroom teacher for J.V., testified that the responsibility for direct supervision and evaluation is with someone within the special education department. *Id.* However, Yales testified that responsibility for evaluation is placed with school principals. Ex. 31 to Scheuneman Decl., Dkt. 173-64 at 21 (Yales 30(b)(6) Depo.).

The classroom teacher is responsible for the oversight of classroom management by the aides who are present. Ex. 15 to Scheuneman Decl., Dkt. 173-48 at 20 (Murillo Depo.). The ratio of students to aides varied depending on the IEPs of the students in the class. Ex. 24 to Scheuneman Decl., Dkt. 173-57 at 5 (Deposition of Darren Knowles ("Knowles Depo.")). The default number of aides was two per classroom. *Id.*

Any complaints about an aide would be handled by the principal. Ex. M to Declaration of Daniel M. Harbottle ("Harbottle Decl."), Dkt. 160-13 at 9 (Deposition of Darren Knowles ("Knowles Depo.")). Special education personnel would not necessarily be involved in the process. *Id.* There was no policy specifically in place on this issue. *Id.*

       3.   <u>Injury Procedures</u>

Mark Maine, the Director of Student Well Being for the District, declared that up to December 16, 2016, the District used a computer program called Zangle Front Office ("Zangle") to log all health information regarding students. Declaration of Mark Maine ("Maine Decl."), Dkt. 162 at ¶ 3; *see also* Ex. P to Harbottle Decl., Dkt. 160-16 at 11 (30(b)(6) Deposition of Jodi Ruby ("Ruby 30(b)(6) Depo.")). The District maintained a Health Services and Programs Manual that provides a written procedure for documenting in Zangle student visits to the health office. *Id.* at ¶¶ 4-5; *see also* Ex. 45 to Scheuneman Decl., Dkt. 178-77. Where parental notification is not specifically required by District policies and procedures, it is within the discretion of the school nurse to decide whether a parent is notified following a visit to the health office. *Id.* at ¶ 6; *see also* Ex. 4 to Scheuneman Decl., Dkt. 173-38 at 16 (Amancio Depo.) (the type of injury determines reporting procedures). No distinction is made in the reporting procedures for disabled and non-disabled students. Ex. 27 to Scheuneman Decl., Dkt. 173-60 at 5 (30(b)(6) Deposition of Fernando Meza ("Meza 30(b)(6) Depo.")); *id.* Ex. 28, Dkt. 173-61 at 21-22 (Ruby 30(b)(6) Decl.)).

According to a form titled "Guidelines for Personnel Making Student Incident Reports," it was the policy of the District to produce incident reports if any of the following applied:

    1.  Injuries that may require medical care;
    2.  Injuries resulting from fights or <u>other</u> contact with other individuals;
    3.  Injuries resulting from defective equipment or unsafe conditions;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

4. Injuries associated with a previous medical condition;
5. Specific injuries requiring completion of a written report:
   a. sprain or dislocations
   b. fractures
   c. eye injuries
   d. permanent tooth loosened or lost
   e. lacerations requiring stitches
   f. burns
   g. all head injuries
   h. nose injuries with swelling
   i. unconsciousness

Ex. 36 to Scheuneman Decl., Dkt. 173-69 at 3.

Fernando Meza, who testified as a witness pursuant to Fed. R. Civ. P. 30(b)(6), stated that, if a parent had a complaint about an injury sustained by a child at school, "the procedure would be to interview the individuals that were present and get statements from either the students or the staff to determine what happened." Ex. 27 to Scheuneman Decl., Dkt. 173-60 at 6 (Meza 30(b)(6) Depo.). He added that if a nonverbal student were to come in with an injury requiring investigation, the first step would be to address the child's injury, and then to notify the principal. *Id.* at 8. The principal would then initiate an investigation. *Id.* The principal would communicate with supervising staff, and could also interview student witnesses. *Id.*

Jodi Ruby, who also testified as a witness pursuant to Rule 30(b)(6), stated that a complaint from a parent would be brought to the school principal from the health services office if necessary. Ex. 28 to Scheuneman Decl., Dkt. 173-61 at 12 (Ruby 30(b)(6) Depo.). Such a complaint would be entered into Zangle, and if there were a need for a referral to another medical professional, a referral form would be provided. *Id.* at 14. There is no requirement that the health assistant or nurse investigate when a student came to the health office with an injury. *Id.* at 20.

Markofski was the nurse at San Antonio, which is where J.V. was enrolled during the relevant time period She stated that she was required to notify parents about certain injuries to students, if students were extremely sick or if they needed to go home. Ex. L to Harbottle Decl., Dkt. 160-12 at 11 (Deposition of Elaine Markofski ("Markofski Depo.")). However, she would not notify parents about a small abrasion or if a student had symptoms of a headache or a stomach ache, but no fever. *Id.* As to the parents of children in the Autism Spectrum and Related Disorders ("ASRD") classroom, she notified them more often, as these students were often nonverbal. *Id.* at 16. When she made such a notification, she would enter the notification into Zangle. *Id.* at 12. She would try to call the parents, and if she could not reach them, she would send home a written note. *Id.* at 13.

Markofski stated that she spoke with J.V.'s mother, Franco, several times. *Id.* at 17. Franco requested that a note be sent home with J.V. on each day that he had been to the nurse. *Id.* At Markofski's deposition, several instances were identified where J.V. was injured or went to the health office but

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | | Date | May 2, 2017 |
|----------|--------------------------|---|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | | |

nothing was entered into Zangle. Ex. 18 to Scheuneman Decl., Dkt. 173-51 at 7-21 (Deposition of Elaine Markofski ("Markofski Depo.")).

    **B.**    **Summary of Events**

        1.    <u>J.V.</u>

            a)    History at San Antonio

J.V., who is currently ten years old, has been diagnosed with autism. Declaration of Anabel Franco ("Franco Decl."), Dkt. 173-21 at ¶ 3. J.V. attended schools within the District from pre-kindergarten until October 2014. Ex. A to Harbottle Decl., Dkt. 160-1 at 13 (Deposition of Anabel Franco ("Franco Depo.")). He began attending San Antonio Elementary School in 2012. *Id.* at 14.

During his first month at San Antonio, J.V. came home with unexplained injuries, such as a black eye. Franco Decl., Dkt. 173-21 at ¶ 7. Between 2011 and 2013, because Franco was concerned about her son's safety, she repeatedly contacted J.V.'s teacher Murillo, District representatives including Green, and San Antonio principals Amancio and Anna Rico. *Id.* at ¶ 8; *see also* Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 6-8 (Franco Depo.). For example, on November 2, 2012, Franco sent an e-mail to Murillo. It stated that she had witnessed aggressive behavior between J.V. and another student. Ex. A to Franco Decl., Dkt. 173-22. On April 15, 2013, Franco sent another e-mail to Murillo expressing similar concerns about the supervision of, and interaction between, students. Ex. B to Franco Decl., Dkt. 173-23. On two occasions while J.V. was a student at San Antonio, he was sent home with a written notice that he had sustained a head injury. Ex. G to Franco Decl., Dkt. 173-28.

The IEP for J.V., which is dated January 16, 2014, stated that J.V. showed mild to moderate aggression. Consequently, it provided a support plan for developing strategies so that he could verbalize his wants and needs instead of using aggressive behavior. Ex. F to Yales Decl., Dkt. 161-6 at 2. It also provided that if J.V.'s "aggression is directed towards another student, adults may move the other student to prevent injury. If necessary, adults will block aggression to prevent injury to other students." *Id.* at 4.

On or about April 27, 2014, J.V. came home with multiple bruises and a puncture wound on his back. Franco Decl., Dkt. 173-21 at ¶ 10. On or about August 29, 2014, he came home with bruises on his thigh and one on his ankle. *Id.* at ¶ 11. Between February 18, 2014 and July 29, 2014, J.V. was sent home with at least eight separate notifications that he had visited the health office. Ex. 46 to Scheuneman Decl., Dkt. 173-78.

When Franco asked J.V. what had happened to cause his injuries, on certain occasions he responded, "Mr. Brian hurt me." Franco Decl., Dkt. 173-21 at ¶ 12; *see also* Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 9, 11 (Franco Depo.) (stating that J.V. told his mother that "Mr. Brian hit me."). Franco made regular attempts to discuss J.V.'s injuries with Murillo, Amancio, J.V.'s new teacher Krivan, and his classroom aides, Soto, Garcia and El Mahmoud. *Id.* at ¶ 14. However, she concluded that she did not receive satisfactory responses. *Id.; see also* Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 11 (Franco Depo.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

(when Franco went to Murillo about J.V.'s statement that El Mahmoud had hit him, Murillo dismissed her concerns). At her deposition Franco testified that she was not allowed to speak directly to the aides at all. Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 14 (Franco Depo.) Therefore, she also contacted Yales and Green. Franco Decl., Dkt. 173-21 at ¶ 15. Green testified that she spent hours before and after school speaking with Franco about her concerns, particularly in connection with the IEPs that were prepared for J.V. Ex. II to Harbottle Decl., Dkt. 180-7 at 9 (Green Depo.).

Franco sought an assessment from Dr. Marjorie Charlop, an outside investigator, in connection with one of the IEPs. *Id.* at ¶ 16. The report from Charlop was completed on April 20, 2014. Ex. J to Franco Decl., Dkt. 173-31. It identified the following primary behavioral problems: "1) noncompliance. 2) noise making, 3) inappropriate verbalizations (cursing), aggression 4) (primarily hitting), as well as 5) lack of motivation to do work he does not seem to enjoy doing or work that is difficult for him (as evidenced by his not performing or the work)." *Id.* at 2. Charlop observed that "when confronted with a demand to do difficult work, [J.V.] will use problem behavior of aggression and inappropriate verbalizations to escape doing it." *Id.* at 5. She suggested that this reaction could be minimized if easier tasks were imposed or stronger reinforcement of J.V. was provided. *Id.* The report also provided certain general suggestions for how certain procedures within the classroom could be better implemented. *Id.* at 5-11.

Not all of Charlop's suggestions were adopted. Green stated that she believed that J.V.'s IEP team, including J.V.'s parents, did not agree with all of the suggestions, Ex. 8 to Scheuneman Decl., Dkt. 173-41 at 32 (Green Depo.). Green stated that she was concerned about the subjectivity of Charlop's report. *Id.* at 48.

In April 2014, Franco wrote a letter to J.V.'s IEP team requesting additional resources for J.V. Franco Decl., Dkt. 173-21 at ¶ 17. The request was denied. *Id.* at ¶ 18. The letter denying the request, which Yales signed, provided:

> The IEP team addressed [J.V.'s] physical safety at length during the January 16, 2014, February 25, 2014, March 17, 2014, April 16, 2014, and May 30, 2014 IEP team meeting, and offered [J.V.] a one-to-one aide during school hours to address your concern. As you were informed at the May 30, 2014 IEP team meeting, implementation of [J.V.'s] one-to-one aide services has caused a reduction, among other things, in [J.V.'s] property destruction and out-of-seat behaviors. [J.V.'s] aide is tasked with, among other things, focusing specifically on [J.V.'s] safety throughout the school day at San Antonio Elementary School. Therefore, it is the District's position that [J.V.'s] physical safety is being appropriately addressed during the school day as provided by law.

Ex. C to Franco Decl., Dkt. 173-24 at 5. The same letter added that the District had provided Franco with all requested incident reports in its possession related to J.V.'s aggressive behaviors as required by law. *Id.*

Franco testified that beginning around August 2014, J.V. began manifesting aggressive behavior. This included yelling profanity and flipping tables. Ex. A to Harbottle Decl., Dkt. 160-1 at 15 (Franco Depo.).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

b)      Training and Testimony of Classroom Aides

Classroom aides who worked with J.V. reported that he frequently displayed violent behavior, particularly when there were certain transitions. El Mahmoud testified that J.V. was "a mean kid." Ex. C to Harbottle Decl., Dkt. 16-3 at 11 (Deposition of Brian El Mahmoud ("El Mahmoud Depo.")). J.V. had particular problems with P.S., a fellow student. El Mahmoud testified that J.V. would "attack" P.S., by hitting, kicking, and spitting on him, and by taking his toys and ripping them up. *Id.* at 9-10. However, El Mahmoud testified, J.V. was "mean to everyone." *Id.* at 10. His behavior included using swear words, spitting in people's faces, kicking, punching and biting. *Id.* at 10-11. El Mahmoud testified that J.V. "would want to fight all day long," including with P.S., other students, teachers and aides. *Id.* at 14. El Mahmoud testified to being "afraid all day" because it was never clear when J.V. would begin hitting, kicking, biting or spitting. *Id.* at 18.

Garcia, an instructional aide in J.V.'s classroom, testified that J.V. "would get aggressive, try to hit or try to throw things" when transitioning or when he did not want to do, or stop doing, something. Ex. D to Harbottle Decl., Dkt. 160-4 at 12 (Deposition of Mary Garcia ("Garcia Depo.")); *see also* Declaration of Mary Garcia ("Garcia Decl."), Dkt. 163 at ¶ 3. She also testified that the incidents reflecting this behavior increased during her time working with J.V. *Id.* at 14-15.

Soto was another instructional aide in J.V.'s classroom. She testified that J.V. used inappropriate language many times each day. Ex. E to Harbottle Decl., Dkt. 160-5 at 11 (Deposition of Daniella Soto ("Soto Depo.")). She said she saw him engage in physical aggression, including swinging and kicking, approximately once a week. *Id.* at 12-13; *see also* Declaration of Daniella Soto ("Soto Decl."), Dkt. 164 at ¶ 3. Soto said that the "stress that [J.V.] would cause in the classroom was pretty intense." *Id.* at 15-16.

Selena Willett ("Willett"), a speech therapist, said J.V. exhibited aggressive behavior such as hitting tables. Ex. Q to Harbottle Decl., Dkt. 160-17 at 10-11 (Deposition of Selena Willett ("Willett Depo.")).

The classroom aides testified that they had received certain training about working with students with disabilities. Garcia testified that she was familiar with, and had received training in, NCPI. She has attended training every two years. Ex. D to Harbottle Decl., Dkt. 160-4 at 11 (Garcia Depo.); *see also* Garcia Decl., Dkt. 163 at ¶ 4. Her most recent training before the incident at issue in this action took place on April 9 and 10, 2014. Garcia Decl., Dkt. 163 at ¶ 4. Soto testified that she had also been trained in NCPI, as well as programs called STAR and PEC. Ex. E to Harbottle Decl., Dkt. 160-5 at 8 (Soto Depo.); *see also* Soto Decl., Dkt. 164 at ¶ 4. Her most recent training before the incident at issue in this action took place on August 28 and 29, 2012. Soto Decl., Dkt. 164 at ¶ 4. El Mahmoud testified that he had been scheduled to go to NCPI training twice before the incident, but had been called back because Krivan was absent or he was needed in the classroom. Ex. 6 to Scheuneman Decl., Dkt. 173-39 at 27 (El Mahmoud Depo.)

El Mahmoud testified that Krivan sometimes seemed distracted in the classroom, and that she spent several hours a day on the computer. *Id.* at 8-9. He stated that he once went to Amancio about the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

amount of work Krivan missed. *Id.* at 13. Garcia also testified that Krivan spent a substantial amount of time on the computer. Ex. 11 to Scheuneman Decl., Dkt. 173-44 at 50 (Deposition of Mary Garcia ("Garcia Depo.")). Amancio testified that Franco also complained to her about a lack of communication from Krivan. Ex. 4 to Scheuneman Decl., Dkt. 173-38 at 15 (Amancio Depo.).

c)      Incident on October 2, 2014

On October 2, 2014, J.V.'s class went on a field trip to the Aquarium of the Pacific. Ex. E to Harbottle Decl., Dkt. 160-5 at 20 (Soto Depo.). While there, J.V. hit a stranger on the back. *Id.* He also ran away from the group, cursed and hit his aide. *Id.* at 25. In a declaration, Soto stated that she saw him playing with a loose tooth with his tongue during the trip. Soto Decl., Dkt. 164 at ¶ 6. Willett also testified that J.V. had been playing with a loose tooth during the trip. Ex. Q to Harbottle Decl., Dkt. 160-17 at 13 (Willett Depo.).

After they returned to the school, Garcia testified that J.V. was watching a movie when Soto asked him to go to the restroom. Ex. D to Harbottle Decl., Dkt. 160-4 at 16 (Garcia Depo.); *see also* Garcia Decl. at ¶ 6. Soto testified that she believed it was Garcia who asked J.V. to go to the restroom. Ex. E to Harbottle Decl., Dkt. 160-5 at 26 (Soto Depo.). J.V. refused. Ex. D to Harbottle Decl., Dkt. 160-4 at 16 (Garcia Depo.); *id.* Ex. E, Dkt. 160-5 at 26 (Soto Depo.). Soto testified that either she or Garcia then asked J.V. again, and he still refused. Ex. E to Harbottle Decl., Dkt. 160-5 at 26-27 (Soto Depo.).

Soto testified that J.V. then swung a chair. Ex. E to Harbottle Decl., Dkt. 160-5 at 21-22 (Soto Depo.); *see also* Soto Decl., Dkt. 164 at ¶ 8. He then walked over to the workstations and attempted to push one over and then crawl under it. Ex. D to Harbottle Decl., Dkt. 160-4 at 16 (Garcia Depo.); *id.* Ex. E, Dkt. 160-5 at 22 (Soto Depo.); Garcia Decl., Dkt. 163 at ¶ 8; Soto Decl., Dkt. 164 at ¶ 9. Garcia testified that she prevented him from doing so. Ex. D to Harbottle Decl., Dkt. 160-4 at 16 (Garcia Depo.). At that point, J.V. began striking her. *Id.* He fell to the floor but continued trying to strike her. *Id.* Garcia testified that she got on her knees and "open-hand held his arms on his chest" after crossing them over each other *Id.* at 16, 20; *see also* Garcia Decl., Dkt. 163 at ¶ 10. She asked J.V. if he was ready for her to let go, and he said yes. *Id.* at 16-17; *see also* Garcia Decl., Dkt. 163 at ¶ 11. Soto testified that during that time, she was attempting to control J.V.'s kicking by blocking his kicks. Ex. E to Harbottle Decl., Dkt. 160-5 at 22 (Soto Depo.); *see also* Soto Decl., Dkt. 164 at ¶ 12. She also testified that Garcia kept telling J.V. to stop hitting, and he "just wouldn't stop." *Id.* at 23.

When Garcia lifted her hold, J.V. began to strike at her again. Ex. D to Harbottle Decl., Dkt. 160-4 at 17 (Garcia Depo.); *id.* Ex. E, Dkt. 160-5 at 23 (Soto Depo.); Soto Decl., Dkt. 164 at ¶ 14. She blocked the strike using her open hands. Ex. D to Harbottle Decl., Dkt. 160-4 at 17 (Garcia Depo.). Garcia testified that she stopped her hold after Willett told her she was doing it incorrectly. *Id.* at 22; *see also* Garcia Decl., Dkt. 163 at ¶¶ 12-13. Soto testified that she told Willett that she was not holding J.V., she was blocking him. Ex. E to Harbottle Decl., Dkt. 160-5 at 43 (Soto Depo.). Garcia and Soto both testified that J.V. pulled out his tooth after the incident, while he was sitting by himself. Ex. D to Harbottle Decl., Dkt. 160-4 at 24 (Garcia Depo.); *id.* Ex. E, Dkt. 160-5 at 24-25 (Soto Depo.). At that time, Soto testified, Willett attempted to calm J.V. down, but he continued kicking and hitting her. Ex. E to Harbottle Decl., Dkt. 160-5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

at 24 (Soto Depo). El Mahmoud testified that he was attempting to get the other students out of the classroom during the incident. Ex. 6 to Scheuneman Decl., Dkt. 173-39 at 20-21 (El Mahmoud Depo.).

Markofski was called to attend to J.V.'s lost tooth. Ex. F to Franco Decl., Dkt. 173-27. She prepared a parent notification that stated that J.V. had lost a baby tooth and was bleeding, but had not wanted to go to the health office. *Id.* The notification stated that by the time Markofski got to the classroom, the bleeding had stopped. *Id.*

Garcia testified that she felt the hold was necessary because she believed the other students in the classroom to be at risk of injury. Ex. D to Harbottle Decl., Dkt. 160-4 at 24 (Garcia Depo.); *see also* Garcia Decl., Dkt. 163 at ¶ 15 ("I believe that on October 2, 2014, prior to and, at times, during the behavior intervention, J.V. was an immediate danger to himself and others in the classroom. He attempted to strike and hit me multiple times. On October 2, 2014, during the moments leading up to the behavior intervention, J.V.'s behaviors were some of the most aggressive and dangerous I had ever observed from him."). She stated that she did not believe any other intervention techniques would have been adequate. *Id.* at 25. At her deposition, Garcia stated that she did not believe she had performed a hold or restraint on J.V. Ex. 11 to Scheuneman Decl., Dkt. 173-44 at 47 (Garcia Depo.). She stated that she did not report the incident to anyone or make a written report because she did not believe it was an incident requiring documentation. *Id.* at 48.

Soto declared that J.V. "was an immediate danger to himself and others in the classroom both prior to and, at times, during the behavior intervention." Soto Decl., Dkt. 164 at ¶ 18. At her deposition, she testified that she had never received specific training involving a student lying on the floor, but that she had been trained to block when a student was hitting her. Ex. 17 to Scheuneman Decl., Dkt. 173-50 at 14 (Deposition of Daniella Soto ("Soto Depo.")).

Willett testified that J.V. was by himself when he was having the tantrum, and that no student was within reach of his limbs. Ex. 3 to Scheuneman Decl., Dkt. 173-37 at 9-10 (Willett Depo.). Green testified that under NCPI, it is not appropriate to perform a hold on someone who is on the ground. Ex. 8 to Scheuneman Decl., Dkt. 173-41 at 28 (Green Depo.); *see also* Ex. 31 to Scheuneman Decl., Dkt. 173-64 at 24 (Yales 30(b)(6) Depo.).

Angele Tovar, an employee with Autism Spectrum Therapies ("AST") who served as J.V.'s one-on-one classroom aide, completed an incident report form that described the incident. Ex. D to Yales Decl., Dkt. 161-4. In the report, she stated that there were nine students present, as well as El Mahmoud, Garcia, Krivan and Soto. *Id.* The incident report stated that J.V. "threw himself to the floor, kicking and swinging, next to where other students were sitting." *Id.* at 3. It added: "Aides held [J.V.'s] arms and legs down while area was cleared of students and chairs. Speech therapist instructed them to stop because they were using an incorrect CPI hold on student. Aides then released [J.V.]." *Id.*

In addition, Willett sent an e-mail to Green that included the following summary of the incident:

During end of the day routine (i.e. bathroom, getting bookbacks [sic], etc.), I heard JV raising his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

voice. I turned to see JV on the floor, laying face up. One aide was holding his arms crossed across his chest and the other aide was restraining his legs, holding them near the shin or ankle. I approached quickly to advise them to back away -- that the particular restraint being used was not appropriate according to NPCI protocol. They immediately backed away, and JV began kicking and punching again. I stood in the non-threatening stance toward JV as the staff quickly removed students to the opposite side of the classroom and removed easily movable items (i.e. chairs) from JV's reach.

Within about 1 minute, JV calmed himself and sat up on his own. I noted that he looked calm (normal breathing, yelling and kicking had ceased), knelt, and asked him if he wanted help putting his shoe on. He attempted to hit me with his shoe. I stood back up and resumed the non-threatening stance. When JV calmed himself a second time (about 10-15 seconds), JV's 1-1 aide knelt and JV allowed her to assist him in putting his shoe on. JV then pulled out his loose tooth. (He remained calm and unaffected by the tooth, I just wanted to include it as a frame of reference. The nurse was called to the room because JV was unwilling to stand to walk to the nurse's office.)

JV completed the rest of the afternoon routine willingly and left by verbalizing "bye" and waving.

Ex. E to Yales Decl., Dkt. 161-5.

Krivan sent an e-mail to, among others, Green, Yales and Amancio informing them of the incident at 3:51 that afternoon. Ex. 38 to Scheuneman Decl., Dkt. 173-71 at 4.

When Franco arrived at school to pick up J.V., Krivan informed her that J.V. had lost a tooth. Ex. A to Harbottle Decl., Dkt. 160-1 at 16 (Franco Depo.). Franco was surprised because J.V. had no loose teeth prior to going to school that day. *Id.*; *see also* Franco Decl., Dkt. 173-21 at ¶ 19. Ten minutes after arriving home, Franco received a call from Krivan informing her that J.V. had been physically restrained that day. *Id.*; see also Ex. 16 to Scheuneman Decl., Dkt. 173-49 at 16 (Deposition of Beatriz Krivan ("Krivan Depo.")). Franco requested additional information, but Krivan was unable to provide it. *Id.* Krivan told Franco there would be an incident report in J.V.'s backpack the following day. *Id.*

After she received the call from Krivan, Franco called Green to inform her what had happened. Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 23 (Franco Depo.). Franco also requested an incident report from Green after Krivan failed to place one in J.V.'s backpack as promised. *Id.*

d) Aftermath of October 2, 2014 Incident

On October 17, 2014, Franco met with Krivan, Willett and J.V.'s AST Supervisor. At that meeting she learned for the first time that it was not Tovar who placed J.V. in the hold. Franco Decl., Dkt. 173-21 at ¶ 22. Franco was again told that she would receive a written report about the incident. *Id.*

On or about October 20, 2014, J.V. came home from school with bruises on his back and rib cage. Franco

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Decl., Dkt. 173-21 at ¶ 23. Franco stated that the school nurse promised to follow up on these injuries but did not. *Id.*

In about November 2014 J.V. was placed on medication for anxiety. *Id.* at ¶ 31.

Sometime that fall, Franco received the incident report. Ex. 29 to Scheuneman Decl., Dkt. 173-62 at 25 (Franco Depo.). She stated that when she finally read the report, she understood why J.V.'s negative behavior had increased. *Id.*

On December 19, 2014, the District entered into a Settlement Agreement with J.V. and his parents. Ex. A to Yales Decl., Dkt. 161-1. The Agreement modified certain terms of J.V.'s IEP, including that the District was required to fund the full cost of basic tuition at the Speech and Language Development Center ("SLDC"), a non-public school. *Id.* at 2. In addition, the District was required to fund a one-to-one aide for J.V. until a new functional behavior assessment was completed, and was required to provide transportation for him for travel to and from his residence and SLDC. *Id.* The District was also required to fund certain behavioral and speech services and one-on-one instruction. *Id.* at 3. In exchange, the parties agreed to release fully and discharge each other for any and all educational claims and remedies accrued as of the date of the Agreement. *Id.* at 4.

On March 31, 2015, counsel for J.V. mailed a claim to the District. Ex. A to Declaration of Elizabeth Eubanks ("Eubanks Decl."), Dkt. 173-17. The District rejected the claim on April 15, 2015. Ex. B to Eubanks Decl., Dkt. 173-18.

Subsequently, on September 30, 2015, an Interim Agreement was entered between the District and J.V. and his parents. It provided for additional evaluation and stated that an IEP team meeting would be convened to review the results of that evaluation. Ex. B to Yales Decl., Dkt. 161-2 at 2. The Interim Agreement also included a release. *Id.*

      2.    <u>B.K.</u>

          a)      History at Simons

B.K. was diagnosed with autism as a young child. Declaration of Cynthia Brown ("Brown Decl."), Dkt. 173-12 at ¶ 3. As a result, he has had significant communication and adaptive deficits. *Id.* He began attending Simons Middle School in September 2013. Ex. B to Harbottle Decl., Dkt. 160-2 at 9 (Deposition of Cynthia Brown ("Brown Depo.")). At that time, he was a student in Shields' classroom. Brown Decl. at ¶ 4. The principal of Simons at that time was Goens. *Id.*

Petro was an aide in Shields' classroom between 2013 and 2015. Ex. K to Harbottle Decl., Dkt. 160-11 at 10 (Deposition of Ana Petro ("Petro Depo.")). Petro testified that she received NCPI training in the second semester of 2014. *Id.* at 9.

Shields stated that, beginning in the 2013-14 school year, he put "voice tone and body language" on his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

agenda to discuss with his aides. Ex. O to Harbottle Decl., Dkt. 160-15 at 10 (30(b)(6) Deposition of Kameron Shields ("Shields 30(b)(6) Depo.")). He stated that this resulted from an observation that Petro's voice became too loud on one or two occasions. *Id.* In addition, a general education teacher and an assistant principal each had come to him expressing concerns about the manner in which Petro addressed students. *Id.* at 12. Further, there had been an incident in his classroom in which Petro and another aide had an argument. Ex. 30 to Scheuneman Decl., Dkt. 173-63 at 45 (Shields 30(b)(6) Depo.). Shields stated that he kept the site administrator apprised of his agenda for the meetings at which voice tone and body language were discussed. Ex. O to Harbottle Decl., Dkt. 160-15 at 16 (Shields 30(b)(6) Depo.).

As of April 2014, B.K.'s IEP stated that he "demonstrates a lot of task avoidance behaviors." Ex. B to Harbottle Decl., Dkt. 160-2 at 9 (Brown Depo.). These included getting out of his seat without permission and laughing aloud at his desk. *Id.*

Brown, who as noted is B.K.'s mother, testified that, beginning in or around November 2014, she noticed a change in B.K.'s behavior. Brown Decl., Dkt. 173-12 at ¶ 5. Specifically, he would flinch and move away from people when they got close to him, and started exclaiming "red face!" if he thought he was in trouble. *Id.* He also began refusing to participate in activities that he had previously enjoyed. *Id.* Brown states that she brought these concerns to the attention of the District but they were ignored. *Id.* at ¶ 6.

        b)      Incident on March 5, 2015

B.K's classroom experienced a shortage of aides on March 5, 2015, when one of the two aides that were normally in the classroom left to work with another student. Ex. 7 to Scheuneman Decl., Dkt. 173-40 at 9 Deposition of Christine Goens ("Goens Depo."). That afternoon, the remaining aide, Petro, took a group of students to the bathroom. Ex. 9 to Scheuneman Decl., Dkt. 173-42 at 19 (Petro Depo.).

Two students, I.V. and D.B., stated that they witnessed Petro restrain and slap B.K. D.B. provided the following testimony:

    D.B.: So she was holding, like, his arm, and, like, she was really close to him, like, her body was pressed against him.
    Q: Okay. Did it appear to you as though she was trying to hold him there?
    D.B.: Yes.
    Q: Did you see him do anything to try to get away from her?
    D.B.: He was trying to, like -- he was trying to move away, but she wouldn't let him.
    Q: And when you say "he was trying to move away," what was he doing?
    D.B.: He was trying to push past her, like, push . . .
    Q: She's pressing against him pushing, and he's pressing back towards -- at her; is that correct?
    D.B.: Yes.
    Q: And then what next did you observe?
    D.B.: She had seen me look, and she gave me a smile, and then walked with him to the -- back to the room. In the back of the room.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

> Q: Well, they're up against each other, and she's pressing against him. He's pressing or pushing against her. And there was -- you said she made a movement with her arm?
> D.B.: Yes.
> Q. What did she do?
> D.B.: She smacked him in the face.
> Q. Smacked him in the face?
> D.B.: Yes.
> Q: Can you show me, gesture yourself, how she used her arm to smack him in the face?
> D.B.: I don't remember which arm it was, but I remember she, like, went like that, just smacked him. Slapped.

Ex. 1 to Scheuneman Decl., Dkt. 173-35 at 11-12 (Deposition of D.B. ("D.B. Depo.")).

I.V. testified:

> [W]e heard a noise so we all turned towards the source of the noise, and we saw the teacher sort of push the student against the wall and then hit him. I don't remember if she hit him with an open hand or a closed hand, but she hit him. And then she saw us. She tried to, like, play it off. And then she took him to the back of the room.

Ex. 2 to Scheuneman Decl., Dkt. 173-36 at 5 (Deposition of I.V. ("I.V. Depo.")).

Petro denied pushing B.K. against the wall, slapping him across the face, or using excessive force against him. Ex. FF to Harbottle Decl., Dkt. 180-4 at 9 (Petro Depo.). After the incident, D.B. and I.V. told Ms. Rivera, a teacher who was nearby, what they saw. Ex. 1 to Scheuneman Decl., Dkt. 173-35 at 19-20 (D.B. Depo.). Rivera told them to go to the principal's office and speak with Goens. *Id.* at 20.

Shields testified that he was called into Goens' office that afternoon and told that two students had reported seeing Petro strike another student. Ex. J to Harbottle Decl., Dkt. 160-10 at 14 (Deposition of Kameron Shields ("Shields Depo.")). Goens stated that she had both D.B. and I.V. write a statement describing what each had seen. Ex. 7 to Scheuneman Decl., Dkt. 173-40 at 18 (Goens Depo.). She then contacted the personnel department. *Id.* She also had her office manager pull Petro from the classroom. *Id.* at 21. Around 2:45 pm, Goens called the Pomona Police Department. *Id.* at 25.

That same day, Shields sent B.K. home with a note. It stated, "No school tomorrow. Have a great weekend." Ex. J to Harbottle Decl., Dkt. 160-10 at 15 (Shields Depo.). He stated that he had not been informed of the incident with Petro at the time he wrote the note. *Id.* at 16.

Brown stated in her declaration that, when B.K. returned from school on March 5, 2015, he had noticeably bruising on his face and his knee was swollen. Brown Decl., Dkt. 173-12 at ¶ 9. B.K. was unable to explain what had happened. *Id.* Brown stated that she was not contacted by anyone from the District until approximately 5 pm. *Id.* at ¶ 10. Goens stated that she contacted Brown between 2:45 and 4 pm. Ex. 7 to Scheuneman Decl., Dkt. 173-40 at 26 (Goens Depo.).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |


c)      Events Following the March 5, 2015 Incident

After she had been informed of the March 5 incident, Brown contacted the District seeking more information about it. Brown Decl., Dkt. 173-12 at ¶ 11. The District would not provide her with Petro's name and would not remove B.K. from the classroom. *Id.* Brown requested a copy of B.K.'s educational file in March 2015. One was not provided to her until three months later. *Id.* at ¶ 12. Brown states that she never requested documentation related to the March 5 incident, including a copy of a Behavior Emergency Report, a notice of head injury or Zangle records. *Id.* at ¶¶ 14-15.

As a result of the incident, Brown kept B.K. out of school for several months because of concerns about his safety. *See* Ex. 7 to Scheuneman Decl., Dkt. 173-40 at 29 (Goens Depo.); *id.*, Ex. 30, Dkt. 173-63 at 49 (Shields 30(b)(6) Depo.). At an IEP meeting on March 17, 2015, Brown stated her concerns about B.K.'s safety following the March 5 incident. Ex. B to Brown Decl., Dkt. 173-14 at 2. She was told that "systems [had] been revised to ensure that adults will not be left alone with students," but that while the investigation into the incident was pending, no further information would be disclosed. *Id.*

Notes from an IEP team meeting on June 4, 2015 reflect that B.K. continued to have behavioral problems at that time, including hitting teachers and parents as well as fear of school. Ex. C to Brown Decl., Dkt. 173-15 at 2. Brown again requested additional information as to the March 5 incident at that time. She was told that the police had taken charge of the investigation. *Id.* Brown also requested that a note be added to reflect that she had raised concerns at a February 24, 2015 meeting that B.K. was displaying defensive gestures while attempting to do homework and writing tasks. *Id.* Shields testified at his deposition that after Brown brought it up, he recalled that he had also noticed B.K. making such gestures. Ex. 30 to Scheuneman Decl., Dkt. 173-63 at 56 (Shields Rule 30(b)(6) Depo.). He stated that through inadvertence, he had left the discussion of those gestures out of the notes for the February 24, 2015 IEP meeting. *Id.* at 57. Shields also said that defensive gestures were not uncommon among his students. *Id.* at 59-60.

Brown states that, since the March 5, incident, B.K. has exhibited "strong negative reactions and fear to individuals resembling Petro." Brown Decl., Dkt. 173-12 at ¶ 19. These individuals have included a woman conducting an assessment on B.K. as well as medical providers. *Id.* B.K. reacts to them by hitting himself, attempting to hit others and generally refusing to cooperate. *Id.*

On August 3, 2015, counsel for B.K. mailed a claim to the District. Ex. C to Declaration of Elizabeth Eubanks ("Eubanks Decl."), Dkt. 173-19. The District rejected the claim on April 15, 2015. Ex. D to Eubanks Decl., Dkt. 173-20.

Petro resigned voluntarily from the District in lieu of termination for cause. Ex. 39 to Scheuneman Decl., Dkt. 173-72 at 10. The grounds for dismissal provided by the District included a finding of several violations of the operative collective bargaining agreement, including "[t]he use of abusive or threatening language or treatment toward fellow employees, customers, the Public, or students," "[i]mmoral conduct," "[e]vident unfitness for service," and use of corporal punishment as a disciplinary measure against a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

student. *Id.* at 2. The following charges were stated:

1. On Monday, March 5, 2015, at Simons Middle School, you isolated and/or confined a non-verbal Special Education student against the wall of a portable classroom.

2. While in the presence of other students, you then hit the non-verbal Special Education student in the face.

3. After striking the non-verbal Special Education student in the face, you then turned to one of the students who observed your misconduct and smiled.

*Id.* at 2-3.

**III. <u>Motions to Exclude Reports and Testimony of Experts</u>**

    **A.    Factual Background**

Both Plaintiffs and Defendants have produced several expert reports in support of their respective positions. Defendants' experts include Derek Ott and Paul Alan Dores. Plaintiffs' experts include Reece L. Peterson and Elisabeth J. Kane. Plaintiffs also produced Jason Travers as a rebuttal witness. In addition, in support of the Motions to Exclude, various declarations from experts were filed.

    1.    <u>Dores</u>

Dores is a licensed psychologist and Board Certified Behavior Analyst -- Doctoral Level ("BCBA-D"). Ex. A Pt. 2 to Harbottle Decl., Dkt. 154-2 at 37. He has 45 years of experience working with individuals with autism and behavioral disorders. *Id.* He also has 16 years of experience as a certified NCPI instructor. *Id.* In both capacities, he has trained and supervised the use of behavior analytic principles in the assessment and replacement of challenging behaviors, and in crisis prevention procedures including preventative behavioral and de-escalation strategies, holds and floor restraints. *Id.*

He was retained by Defendants to provide an opinion regarding the appropriateness of the physical intervention used with J.V. *Id.* Dores opined that if Garcia and Soto's hands

        were placed a quarter of an inch above J.V.'s upper and lower extremities such that, when he moved them upward to hit or kick they could not make contact, then they were blocking J.V. If, however, they lowered their hands, even so much as to place them lightly on top of and in direct contact with J.V.'s extremities then, even in the absence of significant downward pressure, that could reasonably be considered a hold or containment.

*Id.* at 41.

Dores also opined that the key issue in NCPI holds is whether they place undue pressure on the torso,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

thereby compressing the lungs and impairing breathing. *Id.* He observed that there was no direct evidence that this had occurred during the incidents at issue. *Id.* Thus, he said, "we have an intervention that involved blocking, evolving as the incident escalated into a brief hold/containment on the ground where J.V. had placed himself." *Id.* He further stated that the "available documentation suggests that the procedures administered kept J.V., the aides and the other students safe, with no observed undue compression of his chest or restriction of his breathing; no property damage; and no injury to J.V., other students, or staff." *Id.* Dores then concluded that "the physical interventions implemented by Ms. Garcia and Ms. Soto on 10/02/14, were not artful or ideal; however, in my opinion, they were not inappropriate, given the circumstances that these aides faced at the time." *Id.* at 42.

In his deposition, Dores again described the circumstances of the hold on J.V. as "not ideal." Ex. 14 to Scheuneman Decl., Dkt. 173-47 at 7 (Deposition of Paul Alan Dores ("Dores Depo."). He also stated that those involved "did clearly misunderstand the difference between what they believed to be a block and what they were doing, at least at the chest level." *Id.* at 7-8.

       2.   <u>Ott</u>

          a)   Reports

             (1)   <u>J.V.</u>

Ott is a certified psychiatrist/neuropsychiatrist. Ex. A, Part 1 to Declaration of Christine A. Scheuneman ("Scheuneman Decl."), Dkt. 148-5 at 2. He is board certified in Child and Adolescent Psychiatry as well as Adult Psychiatry. *Id.* He has specific expertise in pediatric neuropsychology, including developmental disabilities, *i.e.,* intellectual disability and autism, brain injury and pediatric psychopharmacology. *Id.*

Ott is also an Associate Clinical Professor of Psychiatry at the University of California Los Angeles ("UCLA"), where he is the primary attending physician for both the Westside Regional Center and Lanterman Regional Center Clinics. *Id.* He is also the director of the pediatric neuropsychiatry clinic. *Id.* Ott graduated from Stanford University in 1988 and received a Masters Degree in neuroscience and a Doctor of Medicine Degree from the University of Illinois in 1995. *Id.* at 3. He completed his residency in adult psychiatry at UCLA in 1998, and then continued his training there as a fellow in Child and Adolescent Psychiatry. *Id.* at 3. In 2000, he completed a National Institute of Mental Health Postdoctoral Fellowship at UCLA. *Id.* He now teaches and lectures on topics including "developmental disabilities, behavioral genetic conditions, psychopharmacology of developmental disabilities, seizures/epilepsy, traumatic brain injury, acquired brain injury, and pediatric psychosis." *Id.* In addition, he has a private practice in which he focuses on pediatric psychopharmacology and has published several papers on that topic and on pediatric epilepsy. *Id.*

Ott provided a neuropsychological evaluation of J.V., which is dated January 26, 2017. *Id.* at 2. He was asked to address the "evidence which supports the presence or absence of 'severe emotional distress.'" *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Ott conducted a 20-minute interview with J.V., with approximately 13 minutes of the interview recorded. *Id.* at 5. His notes from that interview are summarized in his report. *Id.* at 5-7. He also conducted a remote interview with J.V.'s mother, which included her statements as to the incidents at issue in this action, J.V.'s past psychiatric issues, his past psychiatric treatment, his past medical history and his schooling. *Id.* at 7. His notes from that interview are also summarized in his report. *Id.* at 7-14.

Ott noted that J.V. had been diagnosed with autism at the age of 3 years, 10 months. *Id.* at 14. Ott concluded that the autism diagnosis had been clearly established and was consistent with J.V.'s history and Ott's own evaluation. *Id.* J.V. has also been diagnosed with mild intellectual disability. *Id.* He has a history of language delay and echolalia, which is the repetition of words or vocalizations made by another person. *Id.* at 15.

Further, J.V. has had a history of low muscle tone from birth. *Id.* Thus, Ott concluded, his history of numerous accidents and injuries dating back to 2009 were not surprising. *Id.* After listing several such injuries that occurred after J.V. began attending San Antonio, Ott stated that it "is apparent that JV's poor coordination, lack of awareness and related issues contributed to multiple and frequent accidents in which he would bump into something/someone trip, fall or have other difficulties which resulted in associated typically mild injuries." *Id.* Ott observed that J.V. continued to have similar incidents after he was removed from San Antonio. *Id.* at 15-16. In addition, J.V. has a history of self-induced injuries and a high pain tolerance. *Id.* at 16.

Ott opined that "[t]he combination of a high pain threshold, poor coordination/balance, self-induced injuries and a proclivity to accidents significantly confounds the ability to determine the specific circumstances related to the origin of these various injuries." *Id.* At the same time, he noted that J.V. has also been described as having sensory sensitivities. *Id.* He concluded that J.V.'s "identified tactile, auditory and gravitational sensitivities further compounds a very vulnerable situation." *Id.* Specifically, "[a]s a consequence of the sensory sensitivities, he is more vulnerable to reacting in a disproportionate way to stimuli[ ] which could be relatively innocuous (e.g. simple physical contact leading to a very pronounced emotional response)." *Id.*

In addition, Ott noted that diagnoses of spinal bifada or seizure activity have not been ruled out. *Id.* at 16-17. J.V. also has long-standing sleep issues. *Id.* at 17.

In order to assess the presence of "severe emotional distress," Ott stated that "it is critical to determine baseline behavioral issues including the possible presence of comorbid psychiatric disorders." *Id.* Ott provided several examples of behavioral issues that manifested prior to the events at issue in this action. *Id.* For example, during psychiatric treatment from 2010-11, "numerous behavioral issues were described including aggression, spitting, defiance, noncompliance, acting out, tantrums, compulsions (including fascination with gloves), hyperactivity and self-induced emesis." *Id.* A 2012 evaluation listed problems such as "hitting for attention, biting, daily tantrums, throwing items, and self-injurious behavior." *Id.*

Ott also noted that J.V. has been diagnosed with attention deficit hyperactivity disorder, and that he has been treated for that condition and others with medications including risperidone, clonidine, Concerta,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

guanfacine and guanfacine ER/Intuniv. *Id.* at 18. He also noted that J.V. "is susceptible to changes in his environment or routine and unpredictability." *Id.* Further, he is susceptible to becoming overwhelmed in crowds. *Id.*

Given this history, Ott expressed disagreement with Plaintiffs' position that J.V.'s injuries while at San Antonio were caused by employees at the school. Rather, he stated, "considering the myriad of issues and confounding factors described above, it is my opinion that more likely that [sic] these injuries could be related to his long-standing proclivity to experience accidents/falls and have associated injuries." *Id.*

Ott also stated that the changes to J.V.'s behavior during his time at San Antonio corresponded to external changes and transitions, such as the presence of substitute teachers and a period of conflict with a male peer. *Id.* It may have been difficult for J.V. to have adjusted to these changes. *Id.* at 19. Further, J.V. started using sertraline during June 2014. That is also when J.V. exhibited both increased aggression and unexplained bruising and could explain one or both. *Id.*

Ott disagreed with the conclusion of Dawn Porter, a Licensed Clinical Social Worker who provided therapy to J.V. beginning shortly after the October 2 incident. Porter stated that J.V. had exhibited signs of PTSD. *Id.* at 20. Ott stated that "[m]any of the symptoms considered by Dawn Porter as consistent with of [sic] PTSD have, in fact, been present previously." *Id.* "These symptoms include aggression, sleep disturbance, irritability, tantrums and [self-injuring behavior]." *Id.*

In conclusion, Ott stated:

> Based on my examination of J.V., interview with his mother and a review of available medical records, I do not see evidence which supports the presence of additional psychiatric diagnoses beyond the previously established diagnoses of autistic spectrum disorder and ADHD. More specifically, I do not see evidence which supports the possible diagnosis of posttraumatic stress disorder (PTSD). Many of the symptoms that are possibly consistent with this diagnosis existed previously or can be explained by other factors including a pre-existing sleep disturbance.

*Id.*

(2)  <u>B.K.</u>

Ott provided a neuropsychiatric evaluation of B.K., which is dated January 26, 2017. Ex. B to Scheuneman Decl., Dkt. 148-7 at 2. He was asked to address the "evidence which supports the presence or absence of 'severe emotional distress.'" *Id.* Ott conducted a 20-minute interview with B.K., approximately 13 minutes of which were recorded. *Id.* at 4. He summarized his observations from that interview in his report. *Id.* at 4-7. He also conducted a remote interview with B.K.'s mother, in which she made statements about the incidents at issue in this action, B.K.'s past psychiatric issues and corresponding psychiatric treatment, his past medical history and his schooling. *Id.* at 5. Ott took notes during that interview and summarized his observations in his report. *Id.* at 5-9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

In his report, Ott stated that B.K. is a 14-year old male with a history of autism and associated symptoms. *Id.* at 9. He was diagnosed with autism when he was about three years old. *Id.* at 10. Ott concluded that the autism diagnosis had been clearly established and was consistent with B.K.'s history and Ott's own evaluation. *Id.* B.K. has also been diagnosed with mild intellectual disability. *Id.* Further, he has certain language deficits that make it difficult for him to communicate. *Id.*

Ott identified certain baseline behavioral issues that he stated were "critical" to determining the possible presence of severe emotional distress. *Id.* As early as 2009, B.K. demonstrated "a high degree of task avoidance" including attempts to run away. *Id.* He also demonstrated behavioral issues in 2013 and 2014 including "noncompliance, tantruming, and limited self-injurious behavior." *Id.* However, behavioral changes were observed subsequent to the events at issue in this action. *Id.* B.K.'s symptoms included hyperactivity, distractibility, impulsivity, self-injurious behavior (biting nails), insomnia and aggression (including hitting and punching his mother). *Id.* Ott noted that many of these symptoms were reported previously. *Id.*

Ott also considered B.K.'s use of the phrase "red face," which he stated is "complicated" to interpret in the context of someone with autism. *Id.* He stated that because B.K. has echolalia, he may have been repeating words he heard spoken by someone else. *Id.* In the alternative, B.K. may have been describing the picture of a red face that was used in the classroom as a behavioral reinforcer. *Id.* at 11.

As an element of his condition of autism, B.K. is sensitive to changes in his environment or routine. *Id.* Thus, Ott opined that the changes to B.K.'s behavior that were observed might have been caused by the removal of B.K. from his prior academic placement. That occurred around the time period at issue in this action. *Id.*

B.K. was also diagnosed with a mood disorder NOS -- "not otherwise specified"[5] -- and ADHD around the time of the incident at issue in this action. *Id.* However, Ott noted that B.K. was 13 years old at the time of these diagnoses. *Id.* Mood disorders of any kind are more frequent in adolescents. *Id.* Further, there is a history of depression among members of the family of B.K.'s mother. *Id.* Symptoms including crying spells, irritability, agitation, sleep disturbance, poor concentration and self-injuring may be associated with depression. *Id.* Regarding the ADHD diagnosis, many of the symptoms had been present long before B.K.'s first visit to a psychiatrist. *Id.* However, prior to that visit, there had been no opportunity to make the diagnosis. *Id.*

Ott noted that there was no indication of PTSD in B.K.'s medical records. *Id.* Nor was there any indication that he had a particularly negative reaction to the events at issue in this action. *Id.* at 12. Further, he did not show evidence of difficulties with possible reminders of the prior experience. *Id.*

Ott also noted that Adderall had been prescribed for B.K. for the first time beginning in May 2015. *Id.* The known side effects of that medication include mood changes and sleep disturbances. *Id.*

---

[5]  The symptoms of this disorder do not meet the criteria for any specific mood disorder. A diagnosis of mood disorder NOS is used when it is difficult to distinguish between symptoms of depression and bipolar disorder.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

In conclusion, Ott opined:

> Based on my examination of B.K., interview with his mother and a review of available medical records, I do not see evidence which supports the presence of additional psychiatric diagnoses beyond the diagnoses of autistic spectrum disorder and ADHD. As previously discussed, I do not see how the diagnosis of mood disorder NOS is relevant for B.K. given the absence of required symptoms. Furthermore, I do not see evidence which supports the possible diagnosis of posttraumatic stress disorder (PTSD), including the presence of anything which would meet the necessary criteria.

*Id.* Ott also repeated his conclusions that many of the symptoms that have been described as relating to the events at issue in this action can be explained by unrelated factors. *Id.*

(3)   <u>Large</u>

Ott provided an opinion about a neuropsychological evaluation of B.K. completed by Mary Large in November 2015. Ex. C to Scheuneman Decl., Dkt. 148-8 at 3. Large also provided a letter to Plaintiffs' attorneys in January 2017. *Id.* Ott's opinion was based on evidence that B.K. suffered from severe emotional distress. *Id.* at 2.

Ott summarized the findings made by Large. *Id.* at 3-5. He made four primary observations: (i) the scope of the documentation Large reviewed was limited; (ii) she did not make any additional diagnoses; (iii) her report does not provide underlying information as to several of the issues in the SAC; and (iv) the analysis as to those issues was limited. *Id.* at 5. Ott also provided the opinion that the evaluation did not adequately consider the effect of medication on B.K. *Id.* He further stated that changes in B.K.'s behavior that were attributed to a "post-traumatic reaction" actually reflected longstanding behavioral patterns. *Id.* In addition, Ott observed that B.K. had not demonstrated "internalizing issues including anxiety, depression or somatization," all of which would be present in the case of severe emotional distress. *Id.*

b)   Rebuttals to Ott

Plaintiffs requested a report from Jason Travers on whether J.V. and B.K. suffered severe emotional distress. Travers was disclosed as a rebuttal witness. In addition, Plaintiffs have submitted a declaration from Marjorie Charlop in support of their Motion to Exclude Ott.

(1)   <u>Travers</u>

Travers was disclosed as a rebuttal witness. He was asked to determine the "probability" that J.V. and B.K. "experienced 'severe emotional distress' resultant of experiences they encountered while attending the Pomona Unified School District." Ex. B to Harbottle Decl., Dkt. 154-3 at 3. The report he produced relied on his expertise in behavioral science, as well as several expert reports produced in this action and deposition transcripts. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Travers is an assistant professor of special education at the University of Kansas and a Board Certified Behavior Analyst-Doctoral Level (BCBA-D). *Id.* at 4. He received a Bachelor of Science in Special Education for Mild-Moderate Disabilities, a Master of Education in Special Education with an emphasis on autism and intellectual disabilities and a Ph.D. in Special Education, all from the University of Nevada Las Vegas. *Id.* He has published 27 peer-reviewed journal articles and edited book chapters in the past seven years. *Id.* He also served as the Special Education Consultant for the Mohawk Trails Regional School District in 2011-12. *Id.* He has taught courses on autism, behavior analysis, functional behavior assessment, classroom management and assessment, among other topics. *Id.* He is on the editorial boards of several leading peer-reviewed journals and is a member of the Association for Behavior Analysis International, an executive board member of the Midwest Symposium on Learning and Behavioral Disabilities, and the recipient of the inaugural Tom E.C. Smith Early Career Award from the CEC-Division of Autism and Developmental Disabilities. *Id.*

In his report, Travers provided academic background on effective educational environments for students with autism. Thus, he provided the opinion that positive behavior intervention and supports are more effective for children with autism than punitive measures. *Id.* at 6. Travers also provided background on the use of physical restraint on children with autism. *Id.* at 7. He cited academic research and guidelines from the Department of Education that state that physical restraint should be used only as a last resort. *Id.* at 8. He also defined corporal punishment. *Id.* at 9-10. Travers cited academic research suggesting that the use of physical restraint and corporal punishment can have serious negative side effects on the subjects. *Id.* at 10-12.

Travers then sought to ascertain if J.V. and/or B.K. had been exposed to a negative educational environment. This inquiry included potential exposure to one or more instances of inappropriate restraint or corporal punishment. He also examined whether such an environment had led to severe emotional distress. *Id.* at 13.

Travers opined that the high level of aggressive behavior reported about J.V. was "consistent with a lack of sufficient professional competence to ensure a safe and effective learning environment." *Id.* at 14. He also opined that, "As with any child, an environment where severe behavior was insufficiently prevented or addressed that led to repeated (undocumented) injuries very likely would result in serious emotional distress to [J.V.] and his peers, especially if encountered on a daily basis for a pro-longed [sic] period of time." *Id.* Further, Travers criticized the failure to implement the suggestions made by Charlop in her assessment of J.V. *Id.* at 14-15. He stated:

> It seems unlikely that the District had other students in this classroom (or others [sic] schools) where a world-class expert consultant's advice was ignored despite reports of repeated injuries that were inexplicable to the parents or self-inflicted according to the PUSD. Such a finding is remarkable and suggests willful mistreatment by classroom personnel and lack of administrative oversight despite ongoing severe behavior problems.

*Id.* at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
| --- | --- | --- | --- |
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Travers also stated that the District's documentation of J.V.'s injuries and visits to the heath office were deficient. *Id.* at 16. He provided the opinion that the lack of documentation may have made it more difficult for others to address J.V.'s situation. *Id.* He stated that, based on the reports of Peterson and Kane and Dores, there was inadequate training on the use of NCPI. *Id.* at 17. He stated that, based upon Ott's report, J.V. "experienced for a prolonged period of time a defective educational environment that failed to address his behavioral needs." *Id.* at 18.

Travers also summarized certain findings by Ott as to B.K., and described the deposition testimony of Shields as to B.K.'s behavior both before and after the March 5, 2015 incident. *Id.* at 18-19. He criticized Ott for relying solely on the testimony of Petro. *Id.* at 18-20. He also speculated that this may not have been the first incidence of abuse from Petro. *Id.* at 21.

In a declaration provided in support of Plaintiffs' Opposition to the Motion to Exclude Travers, Travers noted that he had been awarded tenure at the University of Kansas and promoted to the position of associate professor. Declaration of Jason C. Travers ("Travers Decl."), Dkt. 169-1 at ¶ 1. He stated that he evaluates emotional distress from a different perspective than that of psychologists or psychiatrists. *Id.* at ¶ 4. He looks at it from the perspective of whether Plaintiffs were able to access an effective educational environment and whether they were exposed to inappropriate physical restraint and corporal punishment. *Id.* at ¶ 5. He states that his opinions were based upon "the documents provided to me (including Dr. Ott's report), my expertise about human behavior, the known effects of aversive behavioral intervention and corporal punishment, and effective educational environments for students with autism." *Id.* at ¶ 8.

(a)     Rebuttals to Travers

Defendants have moved to exclude the rebuttal testimony of Travers. In support of the Motion to Exclude Travers, they have submitted declarations from Dores and Ott.

(i)     <u>Dores</u>

Dores provided a declaration in support of Defendants' Motion to Exclude Travers. Declaration of Paul A. Dores ("Dores Decl."), Dkt. 155. In his declaration. Dores stated that since 1990 he has been licensed as a psychologist by the state of California. *Id.* at ¶ 1. He is also a BCBA-D. *Id.* He received that certification in 2005. *Id.* Dores observed that Travers is not a psychologist, social worker or therapist and for these reasons is not qualified to provide a diagnosis for or treatment of mental disorders. *Id.* at ¶ 5.

(ii)     <u>Ott</u>

In a declaration submitted in support of the Motion to Exclude Travers, Ott stated that, based upon his review of the report and C.V. of Travers, Travers is not sufficiently qualified to provide an expert medical, psychiatric or psychological opinion on whether B.K. and J.V. suffered severe emotional distress. Declaration of Derek A. Ott ("Ott Decl."), Dkt. 156 at ¶ 7. Ott also opined that Travers lacks the clinical training to render the opinions that he has proffered. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

(2)     Charlop

Charlop provided a declaration in support of Plaintiffs' Motion to Exclude Ott. She is a Professor of Psychology at Claremont McKenna College and Claremont Graduate University and the Director of the Claremont Autism Center. Declaration of Marjorie H. Charlop ("Charlop Decl."), Dkt. 148-3 at ¶ 1. She has taught Developmental Psychology and Child Assessment courses at the graduate level. *Id.* Charlop has 34 years of professional experience in the field of autism, behavioral psychology with children, and child psychopathology. *Id.* She has over 100 articles in peer-reviewed journals and scholarly presentations at professional national and international conferences. *Id.* Further, Charlop is a licensed psychologist and had a private practice in which she treated children with diagnoses such as anxiety disorders and minor depression. *Id.*

Charlop stated that Ott did not have adequate information to determine that J.V. does not have PTSD. *Id.* at ¶ 3. She also opined that the methodology Ott used to arrive at his diagnosis was unclear, and observed that Ott spent only 20 minutes with J.V. *Id.* at ¶¶ 4-5. Charlop opined that it is particularly difficult to diagnose a child who has autism and limited verbal skills, and that such a diagnosis would require time, persistence and help from the child's parents. *Id.* at ¶ 5.

3.     Peterson and Kane

Peterson and Kane provided an opinion on the treatment of J.V. and B.K. based on documents that were provided to them. Ex. W to Harbottle Decl., Dkt. 160-23 at 5 (Peterson & Kane Report).

Peterson is a professor of special education at the University of Nebraska, Lincoln. *Id.* His research and teaching is focused on violence prevention and intervention and addressing the needs of students with emotional or behavioral disorders in school settings. *Id.* He has authored several articles and a book on the topic of the use of physical restraint and seclusion in schools. *Id.*

Kane is a doctoral student and graduate assistant. *Id.* Her studies have focused on crisis intervention in schools. *Id.* She has submitted several manuscripts for publication and made several presentations on this topic. *Id.*

Peterson and Kane concluded that "unwarranted and inappropriate physical restraint and intervention were implemented" in the cases of J.V. and B.K. *Id.*

In a declaration submitted with Plaintiffs' Opposition to the Motion for Partial Summary Judgment, Peterson opined that the District policy, which is set forth in the Special Education Handbook, is inadequate. Declaration of Reece Peterson ("Peterson Decl."), Dkt. 173-32 at ¶ 4. Peterson stated that the handbook "does not provide adequate detailed guidance to staff regarding behavioral emergencies or prevention and de-escalation techniques." *Id.* For example, it does not include definitions and differences among restraints, holds and blocks. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Peterson and Kane concluded that the NCPI training provided by the District was in accord with national commonly accepted principles and policies. Ex. W to Harbottle Decl., Dkt. 160-23 at 7 (Peterson & Kane Report). However, Peterson stated that "a critical step following crisis situations is creating an incident report, and debriefing and data review to improve effectiveness of programming, to prevent situations from recurring, and to increase safety when interventions are appropriately needed." Peterson Decl., Dkt. 173-32 at ¶ 8. He opined that this step was not properly implemented by the District. *Id.* Further, there was no evidence about either the frequency of NCPI training or the staff that received it. *Id.* at ¶¶ 13-15.

Peterson also provided his opinion that the actions of Garcia and Soto constituted a physical restraint of J.V. *Id.* at ¶ 20. He also stated that once J.V. was lying on the floor, there was no imminent danger that merited his restraint. *Id.* at ¶¶ 24-25.

Regarding B.K., Peterson opined that Petro's behavior was an inappropriate physical intervention. *Id.* at ¶ 29. He states that "[a]ll evidence points to a lack of preventative strategies, lack of clear imminent danger, lack of appropriate use of NCPI procedures, and lack of appropriate documentation procedures." *Id.* at ¶ 31.

### B.    Analysis

#### 1.    Legal Standard

A witness who is qualified as an expert by knowledge, skill, experience, training or education may provide admissible opinions if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts perform a "gatekeeping" function in determining the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 597 (1993). A "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). In determining the reliability of a proffered expert, courts "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendment). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

An expert may not present testimony that merely "parrots" the opinion of others, without providing an independent evaluation of the evidence. *See Matter of James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir.1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him -- information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented. . . . [T]he judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.").

    2.   <u>Application</u>

        a)    Ott

Plaintiffs present two categories of critiques of Ott's reports. The first is that he purports to provide an opinion on the issue whether Plaintiffs suffered emotional distress, but actually opines on the narrow and irrelevant question whether Plaintiffs suffered from PTSD or other psychiatric issues as a result of Defendants' conduct. The second critique is that Ott's methodology is flawed and unclear.

Whether J.V. and B.K. suffered from emotional distress is relevant to several of Plaintiffs' claims, including the one for intentional infliction of emotional distress. SAC at ¶ 157. This claim requires "(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Little v. Stuyvesant Life Ins. Co.*, 67 Cal. App. 3d 451, 461 (Ct. App. 1977). Plaintiffs have also brought claims for negligent supervision, and false imprisonment, in which they allege that Plaintiffs have suffered harm and "severe emotional distress." *Id.* at ¶¶ 128, 185. Plaintiffs also note that emotional distress damages are recoverable in tort actions. Dkt. 148-1 at 18-19.

The parties dispute whether Ott's opinion constitutes an impermissible legal conclusion. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.2004)) (emphasis in original). *A.G.* held that the district court had improperly relied upon the testimony of an expert that certain accommodations were "not legally required by federal or state statute." *Id.*

Ott did not interpret the issue on which he was to opine as a legal one. Rather, his reports state that he was retained to opine based on the evidence as to the "presence or absence of 'severe emotional distress.'" *See, e.g.*, Ex. A Pt. 1 to Scheuneman Decl., Dkt. 148-5 at 2. Plaintiffs argue that Ott's definition of "severe emotional distress" is unclear. But Ott described how he intended to assess distress: "I was directed to determine if any current or past psychiatric issues are present." *Id.* Ott's analysis of these issues is described in detail above. He concluded, based on a review of the evidence, that neither J.V.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

nor B.K. suffered from any psychiatric disorders related to emotional distress, including PTSD. *Id.* at 20; Ex. B to Scheuneman Decl., Dkt. 148-6 at 12.

Plaintiffs argue that whether Plaintiffs suffered from PTSD or other psychiatric issues is irrelevant to whether they suffered from severe emotional distress. In support of this argument, they note that "[c]ompensable emotional distress runs the full gamut of intangible mental suffering, including . . . fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." *Andrade v. Arby's Rest. Grp., Inc.*, No. 15-CV-03175 NC, 2016 WL 7211141, at *15 (N.D. Cal. Dec. 13, 2016) (quoting *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 848 (1998)). The Ninth Circuit has provided several examples as to how a party may seek to establish eligibility for emotional distress damages, including: (i) corroborating medical evidence; (ii) testimony from family members, friends or co-workers; or (iii) through common-sense evidence of egregious conduct. *In re Dawson*, 390 F.3d 1139, 1150 (9th Cir. 2004), *abrogated on other grounds* by *In re Gugliuzza*, No. 15-55510, 2017 WL 1101094 (9th Cir. Mar. 24, 2017).

Plaintiffs are correct that severe emotional distress can be established without a formal psychiatric diagnosis. However, evidence as to psychiatric disorders such as PTSD, which are commonly associated with severe emotional distress, is nonetheless relevant to determining whether or to what extent a party has experienced such distress. Ott's conclusion that Plaintiffs did not suffer from additional psychiatric disorders beyond the previous diagnoses of autism spectrum disorder and ADHD is evidence that a fact-finder may consider in determining whether Plaintiffs has suffered severe emotional distress. That there may be evidence of non-clinical manifestations of emotional distress -- or even that there is contradictory evidence supporting a different psychiatric diagnosis -- does not make Ott's conclusion inadmissible.

No more persuasive are Plaintiffs' arguments that Ott did not explain his methodology and that it is flawed. These arguments are inconsistent. Plaintiffs first argue that Ott has not provided a statement about any methodology on which his opinion could be assessed. They then critique his methodology. Ott listed the sources on which he relied in reaching his opinion that J.V. and B.K. showed no signs of psychiatric disorders that were related to his experiences at issue in this action. These sources included in-person interviews with both plaintiffs and their mothers, reviews of their medical records, and reading deposition transcripts. Medical opinions based upon in-person examinations and review of medical records are routinely admitted. *See, e.g.*, *United States v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002) (a diagnosis that "relied on accepted psychological tests, from which [the expert] drew sound inferences," and "a thorough patient history, including meeting with [the subject's] wife and observing [the subject's] behavior" was based "on proper psychological methodology and reasoning"); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) ("Dr. Kennedy's opinion relied on a physical examination of Mrs. Kennedy and a review of her extensive medical history and records, including laboratory tests."); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1183 (N.D. Cal.) ("As a psychiatrist, it is appropriate for [the expert] to base his opinions on his personal experience and on his interview with [the subject]").

Plaintiffs also argue that Ott improperly opined on the facts of the case. For example, he stated that he "[did] not see evidence that JV was directly harmed or injured by the school staff who were engaging him

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

to keep him and nearby classmates safe." Dkt. 148-1 at 20. He also stated that "it is likely that JV removed his own tooth." *Id.* With respect to B.K., Ott concluded that "BK's reaction to the interaction between [himself and Petro] was minimal." *Id.* These conclusions are not admissible as evidence of how J.V's injuries occurred or the nature of B.K's reaction to his interaction with Petro. However, they were properly used by Ott as the basis for his opinions.

Finally, Plaintiffs' challenge to Ott's methodology and conclusions goes to the weight of Ott's testimony, and not its admissibility. *See Kennedy*, 161 F.3d at 1231 ("Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). For example, the amount of time that Ott spent examining J.V. and B.K. may be used in this manner. Similarly, the argument that Ott reached his conclusions as to the cause of J.V.'s injuries without adequately considering other causes goes to the weight of his testimony, as does Plaintiffs' argument that he did not give adequate consideration to evidence Plaintiffs argue was significant. "Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert." *Id.* at 1230. Rather, the "test is whether or not the reasoning is scientific and will assist the jury." *Id.* Beyond those basic questions, "it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Id.*

Finally, Plaintiffs rely on Charlop's criticisms of Ott's methodology. But Charlop is not a medical doctor, so it is far from clear that she is qualified to opine on the manner in which Ott made his diagnosis. Consequently, her testimony on this issue carries little weight.

For the foregoing reasons, Plaintiffs' Motion is **DENIED**. This ruling is without prejudice to a motion in limine by Plaintiffs that limits Ott's testimony to matters within his medical expertise.

b)      Travers

Defendants argue that Travers lacks sufficient knowledge, education, training or experience to provide an opinion on Plaintiffs' mental state. Further, they argue that his report was not a rebuttal report, and, therefore, should be excluded as untimely.

Plaintiffs disclosed Travers as a rebuttal witness on February 7, 2017. Ex. B to Harbottle Decl., Dkt. 154-3 at 2. The stated purpose of Travers' report was "to determine the probability that Plaintiffs JV and BK experienced 'severe emotional distress' resultant of experiences they encountered while attending the Pomona Unified School District." *Id.* at 3. The report did not specifically state that Travers had been retained to provide rebuttal testimony as to Ott's report. Indeed, Travers' report considered and discussed the reports of Ott, Peterson and Kane, and Dores, and the evaluation of Charlop. However, Ott was the only defense expert who opined on whether Plaintiffs suffered severe emotional distress.

For the reasons discussed above, Ott's opinions as to whether J.V. and B.K. suffered severe emotional distress are admissible, in part. Thus, they are admitted insofar as they express his expert, medical opinion as to the condition of Plaintiffs. To the extent the opinions address a legal issue, *i.e.,* whether Plaintiffs have met their burden of proof as to severe emotional distress, they are inadmissible. Viewing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

Travers' rebuttal testimony in light of these determinations is instructive. Travers is an academic specializing in effective educational environments, behavior intervention and physical restraint. There is nothing in his C.V. or report to show or even suggest that has any expertise with diagnosing psychological disorders or severe emotional distress.

The testimony of a rebuttal expert is "intended solely to contradict or rebut evidence on the same subject matter identified by an initial expert witness." *Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744-BLF, 2015 WL 3509384, at *2 (N.D. Cal. June 3, 2015) (internal citation omitted); *see also United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165 GHK (SS), 2016 WL 6542730, at *4 (C.D. Cal. June 29, 2016) ("[R]ebuttal evidence is appropriate only to 'explain, repel, counteract or disprove the evidence of the adverse party.'"); Fed. R. Civ. P. 26(a)(2)(D)(ii) (rebuttal evidence is "intended solely to contradict or rebut evidence on the same subject matter identified by another party"). Rebuttal experts "cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." *Int'l Bus. Machines Corp. v. Fasco Indus., Inc.*, No. C-93-20326 RPA, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995). If the rebuttal expert's testimony is offered to "contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything close to one.'" *Clear-View Techs.,* 2015 WL 3509384, at *2 (quoting *Amos v. Makita U.S.A.*, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011)).

Travers' report is, at most, competing evidence on an element of Plaintiffs' case in chief -- whether Plaintiffs suffered severe emotional distress as a result of Defendants' policies and actions. It does not address whether Plaintiffs suffered any psychological manifestations of severe emotional distress, which is the matter at issue in Ott's report. To the extent Travers' report does address Ott's diagnosis and methodology, it is inadmissible. Travers is not a medical doctor and is not qualified to provide an opinion on whether Ott's diagnoses are medically sound.

Plaintiffs also argue that Travers' report is admissible rebuttal to the report of Dores. That report addressed the appropriateness of the physical intervention used on J.V. Travers' report discussed the Dores report only briefly, and largely repeated the conclusions in the Peterson and Kane report. Because Peterson and Kane have presented a report on, and can testify about, the appropriateness of the restraint, Travers' testimony as to that matter is redundant and cumulative. *See* Fed. R. Evid. 403 (the court may exclude "needlessly cumulative" evidence).

Finally, Plaintiffs argue that, to the extent Travers' report contains late-disclosed testimony, Defendants were not harmed. Dkt. 169 at 17. Whether to admit late-disclosed expert testimony is an issue governed by an exercise of discretion:

> Rule 26 [of the Federal Rules of Civil Procedure] requires parties to disclose the identity of any expert witness "accompanied by a written report" detailing the opinions the expert will express and the data on which he or she will rely, "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2). Rule 37(c) "gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Because Rule 37(c) "is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

a recognized broadening of the sanctioning power," this court gives "particularly wide latitude to the district court's discretion to issue sanctions" under the rule. *Id.*

*Jarritos, Inc. v. Reyes*, 345 F. App'x 215, 217 (9th Cir. 2009). Fed. R. Civ. P. 37(c) bars evidence that was not timely disclosed unless "the parties' failure to disclose the required information is substantially justified or harmless." *Yeti by Molly*, 259 F.3d at 1106. The party who failed to disclose such information has the burden to show substantial justification for this lapse and that accepting the evidence would not prejudice the non-moving party. *Id.* at 1107.

Plaintiffs argue that Defendants did not even attempt to depose Travers despite having had almost a month to do so. Dkt. 169 at 18. Thus, they contend that Defendants cannot demonstrate that his late disclosure caused prejudice.

For the reasons stated above, Travers' report is inadmissible as rebuttal to either Ott or Dores. Plaintiffs did not offer it for any other purpose. Nor have they provided a sufficient explanation for its late disclosure. Therefore, the exception to Rule 37(c) for late disclosure of testimony that is substantially justified or harmless does not support admission here. Finally, Plaintiffs' argument that Petro's Notice of Joinder in the Motion to Exclude Travers was late-filed is not persuasive. The Notice of Joinder was filed one business day after the Motion to Exclude Travers. Any delay was thus minimal and without consequence.

### C.   Conclusion

The Motion to Exclude Ott is **DENIED**. The Motion to Exclude Travers is **GRANTED**. Petro properly joined in the Motion to Exclude Travers.

### IV.  <u>Motion for Partial Summary Judgment</u>

#### A.   Analysis

##### 1.   <u>Legal Standard</u>

###### a)   Summary Judgment

A motion for summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See id.* Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Where the nonmoving party will have the burden of proof on an issue, however, the movant need only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

demonstrate that there is an absence of evidence to support the claims of the nonmoving party. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

In considering a motion for summary judgment, a court is not to make any credibility determinations or weigh conflicting evidence. All inferences are to be drawn in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987). However, conclusory or speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

> b)    Section 504 and Title II

Section 504 of the Rehabilitation Act "is concerned with discrimination in the provision of state services to all individuals with disabilities." *A.G.,* 815 F.3d at 1203. It provides that

> [n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. The regulations adopted pursuant to Section 504 "require qualifying public schools to 'provide a free appropriate public education [("FAPE")] to each qualified handicapped person.'" *A.G.,* 815 F.3d at 1203 (quoting 34 C.F.R. § 104.33(a)). These regulations "gauge the adequacy of services provided to disabled individuals by comparing them to the level of services provided to individuals who are not disabled." *Id.*

Title II of the ADA was modeled after Section 504 and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* (quoting 42 U.S.C. § 12132).

In the Ninth Circuit:

> [a] plaintiff bringing suit under section 504 or Title II of the ADA must show: (1) she is a qualified individual with a disability; (2) she was denied "a reasonable accommodation that [she] needs in order to enjoy meaningful access to the benefits of public services;" and (3) the program providing the benefit receives federal financial assistance.

*Id.* (quoting *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

A plaintiff may satisfy the second prong of this test (i) "by showing that the federally funded program denied her services that she needed to enjoy meaningful access to the benefits of a public education and that were available as reasonable accommodations," or (ii) "by showing that the program denied her meaningful access to public education through another means, such as by violating a regulation that implements section 504's prohibitions." *Id.* at 1204.

"[A] public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Id.* (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008)).

c)    Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection applies whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*

A two-step analysis is used to determine whether a person is entitled to qualified immunity. First, it must be determined "whether the officer violated a plaintiff's constitutional right." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). If that is established, the next step is to determine "whether the constitutional right was clearly established in light of the specific context of the case at the time of the events in question." *Id.* (internal quotation marks omitted). The two-step inquiry need not always proceed in this order. *Pearson*, 555 U.S at 236 ("[W]hile the sequence set forth [] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Thus, government officials may not be granted qualified immunity "on the ground that it was not clearly established at the time . . . that their conduct was unconstitutional," without a corresponding determination as to whether a constitutional right was indeed violated. *Id.* at 227, 234-35; *see also id.* at 237 ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.").

In light of these limitations, to present a viable claim,

> [t]he "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The question is what the officer reasonably understood his powers and responsibilities to be, when he acted under clearly established standards." *Saucier v. Katz*, 533 U.S. 194, 208 (2001).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

> To determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003), *cert. denied*, 543 U.S. 825 (2004). "Rather, the 'standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity.'" *Serrano*, 345 F.3d at 1077 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

*W.A. ex rel S.A. v. Patterson Joint Unified Sch. Dist.*, No. CV F 10-1317 LJO SMS, 2011 WL 2925393, at *37 (E.D. Cal. July 18, 2011).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005).

To establish a claim under § 1983, a plaintiff must allege facts that support each of the following four elements: (i) a violation of constitutional or other federal rights; (ii) proximately caused; (iii) by the conduct of a person; (iv) acting under color of law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

    2.    <u>Application</u>

        a)    Evidence of Disability Discrimination

Plaintiffs allege that their rights under Title II were violated because:

> Plaintiff students, who are students with disabilities, are either not provided programs, services, and activities that are provided to non-disabled students, or are provided programs, services, and activities that are not equal to, and are inferior to, the services provided to students who are not physically disabled. Plaintiff students in fact were abused because of their disabilities, which amounts to disability discrimination. Defendants have demonstrated a deliberate indifference to the fact that harm to Plaintiffs' federally protected rights under the ADA was substantially likely, and failed to act upon that likelihood.

SAC at ¶ 108.

Plaintiffs argue that their Section 504 rights were violated because, "[s]olely by reason of their disabilities, Plaintiffs have been excluded from participation in, denied the benefit of, and subjected to discrimination

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

in their attempts to receive full and equal access to the facilities, programs, services, and activities offered by Defendants." Id. at ¶ 117.

Defendants respond that discrimination under Section 504 and Title II can be shown only with evidence of each of the following: (i) disparate impact; (ii) disparate treatment; and (iii) failure to accommodate. Dkt. 158-1 at 11 (citing *J.V. v. Albuquerque Public Schs.*, 813 F.3d 1289, 1295 (10th Cir. 2016)). They argue that Plaintiffs have only pleaded or otherwise sought relief under the first two theories. Further, they argue that Plaintiffs have not provided evidence that could prove that they were subject to either disparate impact or disparate treatment discrimination. At the hearing, Defendants argued that Plaintiffs had only recently adopted a theory of failure to accommodate, which was not pleaded in the SAC. They contend that Plaintiffs should not be permitted to add a new theory of the case so fair into litigation.

Turning to these issues, Defendants mischaracterize the standard for a violation of Section 504 and Title II. The Ninth Circuit has held that "§ 504 prohibits not only 'discrimination' against the disabled, but also 'exclu[sion] from . . . participation in' and 'deni[al] [of] the benefits of' state programs solely by reason of a disability." *Lemahieu*, 513 F.3d at 937 (quoting 29 U.S.C. § 794(a)). Similarly, under Title II, "a plaintiff must show that (1) she is a qualified individual with a disability; (2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of her disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

Notwithstanding the Tenth Circuit authority cited by the Defendants, the Ninth Circuit has declined to require that claims such as those advanced here must be defined according to "disparate impact," "disparate treatment" and "failure to accommodate." *See Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) ("Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate impact,'" the Supreme Court has "determined it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services."). Thus, Plaintiffs were not required to plead one of those theories in the operative complaint. A public entity is liable under Title II and Section 504 if it "intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *A.G.,* 815 F.3d at 1203. Defendants' attempt to apply this standard only through the individual categories of "disparate impact," "disparate treatment" and "failure to accommodate" is not persuasive.

Plaintiffs have provided evidence that, construed in the light most favorable to them, shows triable issues of fact. Thus, there is such an issue as to whether the policies and procedures of the District failed to provide Plaintiffs with meaningful access to education because of their disability. There is also evidence in the record sufficient to show a triable issue as to whether the District ensured that staff members responsible for disabled students had sufficient and up-to-date training in restraint techniques. Green testified that biannual NCPI training was "highly recommended" but not mandatory. Yales testified that NCPI training is a part of the new-hire training provided to teachers and aides, but stated that if a new hire missed that day of training, he or she would still be able to start work. Soto testified that she had not attended NCPI training for more than two years prior to the incident in which she restrained J.V., and El Mahmoud testified that he had missed two consecutive NCPI trainings because he was required in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

classroom. As a result of this missed and inadequate training, J.V. claims to have been subjected to an improper hold that resulted in increased behavioral problems and emotional distress. That Plaintiffs did not explicitly state in the Complaint that providing adequate training would have been a "reasonable accommodation" to their disabilities is not fatal. There is no showing of prejudice to Defendants in terms of their ability to respond to this slightly different theory.

Similarly, Plaintiffs have pointed to evidence that supports their claim as to the inadequacy of the injury reporting procedures for students with disabilities, particularly those who are non-verbal or have limited communication skills. No distinction was made in the reporting procedures for disabled and non-disabled students. Whether to alert parents to a student's injury was left to the discretion of the school heath officer. There does not appear to have been a formal investigation procedure, and record-keeping was inconsistent. Although all visits to the school health office were supposed to be entered into Zangle, Zangle records for J.V. were incomplete. The lack of documentation made it difficult to assess the frequency and severity of injuries suffered by students with disabilities like those at issue here. Again, the failure to specifically state in the Complaint that better reporting procedures would have accommodated Plaintiffs' disabilities does not provide grounds for summary judgment.

In sum, a triable issue has been presented as whether the District failed to provide meaningful access to an education for disabled students, or failed to provide them with a reasonable accommodation that could have enabled them such access. Defendants' argument that none of this alleged discrimination took place because of Plaintiffs' disability is unavailing. It is uncontested that B.K. and J.V. both had autism, and that this diagnosis caused certain behavioral problems and made it difficult for them to communicate. *See Miller v. Monroe Sch. Dist.*, 159 F. Supp. 3d 1238, 1249-50 (W.D. Wash. 2016) (genuine issue of material fact precluding summary judgment where Plaintiff had autism that caused him to be disruptive and aggressive and no action was taken to ensure that aversive interventions were properly performed). Thus, a failure properly to train staff on holds necessary to manage students with behavioral problems, or to address the medical needs of non-verbal students, would negatively affect Plaintiffs because of their disability.

Further, it is not dispositive of their claim that Plaintiffs did not ask for accommodation. "[A] plaintiff's failure to expressly 'request' an accommodation is not fatal to a claim where the defendant otherwise had knowledge of an individual's disability and needs but took no action." *A.G.*, 815 F.3d at 1207 (quoting 1 Americans with Disabilities: Practice and Compliance Manual § 1:247 (2015)). It is uncontested that Defendants here knew that Plaintiffs had behavioral problems and difficulties communicating. It is also uncontested that Defendants were made aware that Plaintiffs had previously experienced injuries while at school.

The cases cited by Defendants do not change this outcome. Defendants rely primarily on *Garedakis v. Brentwood Union Sch. Dist.*, 183 F. Supp. 3d 1032 (N.D. Cal. 2016), in which six plaintiffs with autism or Down's Syndrome sued their school district. The facts of that case bear some similarity to those here: the plaintiffs alleged that they had been grabbed or hit by a teacher in the district. *Id.* at 1036. Several of the plaintiffs were diagnosed with PTSD by an expert psychologist. *Id.* at 1037. The court concluded that the plaintiffs had failed to show that any resulting harm was because of their disabilities. *Id.* at 1042. Rather,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

they had provided evidence that would show that one particular teacher was abusive. There was no evidence to indicate that this teacher was assigned to the students by reason of their disabilities, or that her alleged abuse was because of their disabilities. *Id.* at 1042-43.

Defendants also rely on *Albuquerque*, 813 F.3d 1289. There, the parents of a second-grader with autism brought an action under Title II after the student was handcuffed. The district court granted Defendants' motion for summary judgment because the evidence showed that the student had been handcuffed "based on his conduct -- two hours of disruptive behavior, including running from room to room and kicking Ms. Martinez and Officer Sanchez and refusing to stop -- not by reason of his disability." *Id.* at 1296.

*Garedakis* and *Albuquerque* are distinguishable. As noted above, Plaintiffs here have advanced the theory that the District's injury reporting and response policies, as well as the inadequate training in crisis prevention and non-violent restraint, deny students with disabilities meaningful access to an education. This argument is not confined to a single teacher, classroom or act of restraint, as were the arguments of the plaintiffs in *Garedakis* and *Albuquerque.*

Finally, Defendants' argument that Plaintiffs' responses to interrogatories did not provide evidence of the requisite causal connection between the District's challenged practices and students' disabilities is not persuasive. There is other evidence that supports the finding of a triable issue of fact. There is no showing of prejudice to Defendants that results from considering such evidence, notwithstanding the interrogatory responses.

Defendants also argue in passing that Plaintiffs' individual claims for monetary damages under Title II and Section 504 fail "for the same reasons articulated herein" because Plaintiffs have not met their burden of showing deliberate indifference. Dkt. 158 at 18. They cite to *Lemahieu*, which defines deliberate indifference as "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Lemahieu*, 513 F.3d at 938. For the reasons stated above, Plaintiffs have provided evidence sufficient to create a triable issue on the claims under Title II and Section 504. This includes evidence that supports the claim that Defendants were aware of the potential weaknesses in their training and injury-reporting procedures, knew or should have known that those weaknesses were likely to have a particular impact on disabled students with behavioral and communication issues, and did not act to address those weaknesses.

b)      Exhaustion

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, provides certain protections to students with disabilities. Plaintiffs seeking relief for violations of the IDEA must first exhaust their administrative remedies. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017). There is no parallel exhaustion requirement under Title II and Section 504.

Plaintiffs here have not sought relief under the IDEA. However, if a suit brought under Title II or Section 504 "'seek[s] relief that is also available under' the IDEA, the plaintiff must first exhaust the IDEA's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

administrative procedures." *Id.* Defendants argue that "Plaintiffs' SAC seeks to redress what they believe to have been an inappropriate public education from the District." Dkt. 158 at 18-19. Therefore, they argue that Plaintiffs were required to exhaust their administrative remedies before filing suit. *Fry* concluded that such exhaustion is not necessary when "the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee -- what the Act calls a 'free appropriate public education [("FAPE")].'" *Fry*, 137 S.Ct. at 748 (quoting 20 U.S.C. § 1412(a)(1)(A)).

As defined in the IDEA, a FAPE "comprises 'special education and related services' -- both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* at 748-49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)). An IEP is the primary vehicle for providing a FAPE. *Id.* at 749. A parent who does not believe that an IEP is providing a FAPE "may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides)." *Id.*

The Supreme Court explained the fundamental difference between the IDEA and the overlapping disability discrimination statutes as follows: "[T]he IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Id.* at 756. In practice, however, the distinction between the coverage of these two statutory regimes can be difficult to define. *Fry* identified certain "clues," which were phrased in the form of questions. First, "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school"? *Id.* Second, "could an *adult* at the school -- say, an employee or visitor -- have pressed essentially the same grievance?" *Id.* The Court also stated that "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE." *Id.* at 757.

Here, the "clues" that the Supreme Court have identified are of limited help. It is difficult to imagine an adult employee or visitor at the school would have some type of outburst that would result in the need to employ a physical restraint. However if, for example, the conduct Plaintiffs argue took place in the schools in the District had instead occurred in a daycare center that was not subject to the IDEA, they would still have a claim under Title II that the lack of proper procedures and training effected discrimination by preventing them from meaningful access to daycare. This supports the view that the "gravamen" of Plaintiffs' SAC is not the denial of a FAPE.

Further, the Ninth Circuit has noted that "[a]lthough both the IDEA and the Section 504 regulation use the locution 'free appropriate public education,' or 'FAPE,' . . . the two FAPE requirements are 'overlapping but different.'" *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013); *cf. A.G.*, 815 F.3d at 1203 ("[A] showing that FAPE was denied under the IDEA does not necessarily establish a denial of FAPE under section 504."). "The most important differences are that, unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Lemahieu*, 513 F.3d at 933.

*K.M.* also discusses the difference between the IDEA, which it describes as "process-oriented," and Title

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

II, which "imposes less elaborate procedural requirements":

> [T]he IDEA and Title II differ in both ends and means. Substantively, the IDEA sets only a floor of access to education for children with communications disabilities, but requires school districts to provide the individualized services necessary to get a child to that floor, regardless of the costs, administrative burdens, or program alterations required. Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but *equally* accessible to people with communication disabilities, but only insofar as doing so does not pose an undue burden or require a fundamental alteration of their programs.

*K.M.*, 725 F.3d at 1097 (emphasis in original).

Pursuant to the standards articulated in *Fry*, *Lemahieu* and *K.M.*, exhaustion of remedies available pursuant to the IDEA is not required here. The gravamen of Plaintiffs' claims is that the systems in place within the District to regulate and address injuries and restraints do not take into account the unique problems associated with children with disabilities. Thus, Plaintiffs' access to a fair and adequate public education is limited in ways that do not affect students who are not disabled. This is not a problem that could be addressed by individual tailoring. *See Fry*, 137 S. Ct. 756. Nor is it "process-oriented." *K.M.*, 725 F.3d at 1097. Rather, it concerns "making existing services not just accessible, but *equally* accessible to people with communication disabilities." *Id.* For these reasons, administrative exhaustion is not required.

c)    Immunity

Defendants next argue that Soto, Garcia, Shields, Krivan, Murillo, Amancio, Green and Yales are subject to qualified immunity as to the Section 1983 claim for a Fourth Amendment violation. They also argue that no evidence has been presented as to Martinez.

(1)    <u>Soto and Garcia</u>

Defendants first raised the qualified immunity defense in their Motion to Dismiss. The Order ruling on that Motion concluded that the allegations against Soto and Garcia in Plaintiffs' complaint -- *i.e.*, that they "intentionally and unlawfully restrained . . . J.V. for no pedagogical purpose" -- were sufficient to state a claim for a Fourth Amendment violation. Dkt. 122. at 27.

In support of this conclusion, the Order cited *Preschooler II v. Clark Cty. Sch. Bd. of Trustees*, 479 F.3d 1175 (9th Cir. 2007). In that case, the plaintiff alleged abuse "ranging from being beaten, slapped, and body slammed to unexplained bruises and shoeless walks from the school bus to the classroom." *Id.* at 1177. The *Preschooler II* court noted that "the right of a student to be free from excessive force at the hands of teachers employed by the state was clearly established as early as 1990." *Id.* at 1178. The court concluded that the "beating, slapping, and slamming of Preschooler II . . . violated the Fourth Amendment's prohibition of the use of excessive force against public schoolchildren." *Id.* at 1180. The court noted that its decision was influenced in part by the fact that the plaintiff was "severely disabled and . . . so young at the time of the abuse." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

The Order denying Defendants' Motion to Dismiss on the Fourth Amendment claim against Soto and Garcia also cited *Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906 (9th Cir. 2003). In that case, a vice principal taped the plaintiff to a tree after he refused to stand still as a punishment for fighting. *Id.* at 907. The court concluded that the vice principal was not entitled to qualified immunity. *Id.* In reaching this conclusion, the court noted that, "[i]n applying the Fourth Amendment in the school context, the reasonableness of the seizure must be considered in light of the educational objectives [the vice principal] was trying to achieve." *Id.* at 907. At the time he was taped to the tree, the plaintiff's only offense was "horsing around" and refusing to stand still. *Id.* at 909-10. There was no indication that he posed a danger to other students. *Id.*

Viewing the evidence submitted under the applicable summary judgment standards, it is undisputed that J.V. had a history of violent behavior against teachers, classmates and strangers. On the date of the incident, he was watching a movie with his classmates when he was asked to go to the restroom. He refused. Instead, he stood up and picked up a chair, which he attempted to swing or throw. He then walked over to one of the workstations in the classroom and attempted to knock it over and then to crawl under it. Garcia blocked him, at which point J.V. began to hit her.

J.V. then fell to the floor but continued to strike and kick. Garcia got on her knees, crossed J.V.'s arms, and held them lightly to his chest. Soto also got on her knees and held her hands on or just above J.V.'s legs. Garcia asked J.V. if he was ready to be let go, and he said he was, but then started kicking and hitting again. At that point, Willett entered and told Garcia and Soto to let go of J.V. because their restraint was improper. They did so. At the hearing, Plaintiffs argued that J.V. calmed himself after the restraint was lifted, but this is not shown in the evidence. Rather, Willett testified that she did not remember whether J.V. became aggressive when the hold was released. Ex. 3 to Scheuneman Decl., Dkt. 173-37 at 15 (Willett Depo.). However, she subsequently testified that he had a tantrum including "hitting, kicking, yelling [and] crying" for "a couple minutes." *Id.* at 17, 20. At some point, he self-soothed, and Willett knelt down to help J.V. put on a shoe that he had taken off during his tantrum. *Id.* at 10. In response, he threw it at her, and then calmed down again. *Id.* After the shoe had been put back on, J.V.'s tooth came out. By the time Franco looked at the lost tooth, it was split in half. Franco had not noticed that J.V.'s tooth had been loose.[6] The hold performed by Garcia and Soto did not comply with NCPI procedures, which are the only approved procedures in the District.

Given these undisputed facts, Soto and Garcia are entitled to qualified immunity. The prohibition against the use of excessive force against students is well-established, but "[i]t will not suffice to merely articulate a broad constitutional right." *Miller*, 159 F. Supp. 3d at 1248 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.* "The Court determines 'reasonableness' by 'careful[ly] balancing . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

---

[6] Although there is a dispute as to the manner in which J.V.'s tooth came loose, it is not material to this issue in the absence of any evidence of excessive force.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

governmental interests at stake." *W.A. ex rel S.A.*, 2011 WL 2925393, at *37.

Here, Plaintiffs have not identified evidence sufficient to demonstrate that the force here was unreasonable under the circumstances. Unlike in *Preschooler II*, it cannot be said that J.V. "posed no danger to anyone nor was he disruptive in the classroom." *Preschooler II*, 479 F.3d at 1180; *see also Hawaii Dep't of Educ.*, 334 F.3d at 909-10 (no indication that the student posed a danger to other students). Defendants have provided evidence, which Plaintiffs have not rebutted, that J.V. was attempting to hit and kick Soto and Garcia prior to and during the hold, and that he continued to hit and kick after the hold was released. There is clearly an interest in protecting teachers and students from violence in the classroom. Plaintiffs have presented evidence that there were no students within arm's length of J.V. while he was in the hold. However, this does not indicate that there would be no danger to students when he was released from the hold. Further, the undisputed evidence is that J.V. was continuing to attack adults in the classroom after he was released from the hold, although he eventually calmed down.

Moreover, the intrusion into J.V.'s Fourth Amendment interests was substantially lower than those in the cases Plaintiffs have cited in support of their position. In *Preschooler II* the plaintiff was beaten, slapped and body-slammed. *Preschooler II*, 479 F.3d at 1177. In *Hawaii Dep't of Educ.*, the plaintiff's head was taped to a tree for five minutes. *Hawaii Dep't of Educ.*, 334 F.3d at 907. In *P.B. v. Koch*, 96 F.3d 1298 (9th Cir. 1996), plaintiffs were slapped, strangled and thrown headfirst into a locker. *Id.* at 1299. Here, Plaintiffs have provided evidence that the hold on J.V. improperly performed, but not that the force used was greater than required to prevent J.V. from continuing to hit and kick. Further, the only evidence Plaintiffs have provided of an injury resulting from the incident is that J.V. lost a tooth. However, several of the witnesses present testified that J.V. had been playing with a loose tooth all day, and that he pulled out the tooth himself after he had been released from the hold. The only evidence to the contrary is Franco's testimony that she had not noticed that J.V.'s tooth had been loose. However, as noted above, this evidence does not create a genuine issue of material fact in the absence of any evidence linking the loss of the tooth to the alleged use of excessive force. For example, there is no evidence that the hold caused some form of head trauma.

Viewing the actions of Soto and Garcia in context, and viewing all undisputed facts, summary judgment is warranted on the § 1983 claims in which they are named.

(2)    Supervisory Liability

Plaintiffs seek to establish supervisory liability against Krivan, Murillo, Amancio, Green, Yales and Shields. A "supervisor is liable for the acts of his subordinates "if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them." *Preschooler II*, 479 F.3d at 1182 (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)). Supervisory liability may also lie

against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others.

*Id.* at 1183 (*Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005)).

(a)     Krivan, Murillo, Amancio, Green and Yales

Defendants argue that Plaintiffs rest their § 1983 claims on the theory that Krivan, Murillo, Amancio, Green and Yales failed adequately to respond to J.V.'s unexplained injuries. However, as Defendants note, the prior Order on Defendants' Motion to Dismiss concluded that those injuries could not form the basis for a claimed Fourth Amendment violation. *See* Dkt. 122 at 27 ("Plaintiffs cannot state a constitutional violation as to J.V.'s alleged unexplained injuries. Therefore, the Motion is **GRANTED** without prejudice as to his Fourth Amendment claims on that basis.") (Emphasis in original). Defendants argue that, to the extent the § 1983 claims rest on the theory that Krivan, Murillo, Amancio, Green and Yales failed to train and supervise Soto and Garcia, those claims should fail because only Amancio was their direct supervisor, and because the improper hold did not rise to the level of a constitutional violation. Plaintiffs respond that Defendants had sufficient knowledge to prevent the illegal restraint on J.V. but failed to do so. But, for the reasons stated above, the restraint used on J.V. did not violate his constitutional rights. Thus, that restraint cannot provide the basis for a § 1983 claim against the supervisors of Soto and Garcia.

Plaintiffs also state that they have provided evidence "that those acting on behalf of J.V. informed these Defendants of the likelihood that J.V. was being abused or improperly restrained, and Defendants failed to take any corresponding action to prevent it." Dkt. 173 at 29. They further argue that,

> [t]his case is not about "unexplained injuries." Defendants ignored reported explanations, including that J.V. himself identified a classroom instructional aide, Mr. Brian, as hurting him. SUF 289-90. Franco immediately notified Defendants of these allegations, but they completely disregarded her and failed to do any follow-up investigation or training in response. SUF 290.

*Id.* at 30-31.

However, the core evidence that Plaintiffs have presented that J.V. was being abused or improperly restrained is that J.V. suffered unexplained injuries while at school. It already has been determined that such evidence could not provide the basis for a Fourth Amendment violation. Further, in the Order regarding the Motion to Dismiss, the Court concluded that the allegation in the FAC that J.V. sometimes said "Mr. Brian" in response to questions as to how he had gotten injured was insufficient to state a claim under the Fourth Amendment against El Mahmoud. Dkt. 122 at 28. There is no basis to revisit these conclusions.

(b)     Shields

Defendants argue that Shields cannot be liable for the alleged violations of B.K.'s Fourth Amendment

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|----------|--------------------------|------|-------------|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

rights due to the conduct of Petro because he was not Petro's direct supervisor and had no knowledge that Petro presented a threat to students. Plaintiffs argue that Shields knew of Petro's prior aggressive incidents with developmentally disabled students and failed to act to prevent future ones.

There is evidence that Shields was aware of two incidents in which other employees at Simons had reported to him discomfort with Petro's tone of voice and body language when interacting with developmentally disabled students. He had also observed that Petro raised her voice inappropriately on one or two occasions, and had witnessed a verbal argument between Petro and another aide in class.

None of these observations is sufficient to create a triable issue as to whether Shields should have been on notice that Petro was likely to engage in violence against a student that would deprive that student of his or her Fourth Amendment rights. All of the instances of inappropriate behavior observed by Shields concerned inappropriate tone of voice and volume, or at most a tendency to be verbally aggressive. Plaintiffs have provided no evidence that verbal aggressiveness can constitute an unconstitutional search or seizure under the Fourth Amendment. Therefore, summary judgment is appropriate as to Shields under qualified immunity.

(c)    Martinez

Defendants note that there is no evidence in the record as to Martinez. Plaintiffs argue that, as the Superintendent, Martinez is responsible for remedying the District's discriminatory policies. They note that California Educational Code § 35020 provides that "[t]he governing board of each school district shall fix and prescribe the duties to be performed by all persons in public school service in the school district."

Plaintiffs identify several policies of the Pomona School Board. The Superintendent is required to designate a "District Safety Director," who is responsible for "preparing and implementing a district safety program." Ex. E to Plaintiffs' Request for Judicial Notice, Dkt. 173-6. That program "shall include reporting and investigating procedures, and an in-service safety training program." *Id.* at 2 The Superintendent is also responsible for appointing a standing district safety committee." *Id.* at 3. In addition, the Superintendent "is directed to provide training in the duties of child abuse reporting to instructional and teacher aides," and is tasked with ensuring that mandatory reporting laws are carried out. *Id.* at 6; *see also id.* at 12. He is also required to provide staff members with training opportunities. *Id.* at 8. The Board has directed the Superintendent "to seek review and input from the district physician for all procedures pertaining to student accidents." *Id.* at 9. That provision also states that "[a] complete accident report shall be made by the certificated staff member under whose supervision the accident occurs," although there is no indication that such report is the responsibility of the Superintendent. *Id.* at 9-10. The Board has also directed the Superintendent to "explore funding and assistance available for the establishment of programs directed toward preventing the occurrence of child abuse, including physical abuse, sexual assault, and child neglect, and reducing the general vulnerability of children, including coordination with and training for parents and school staff." *Id.* at 13.

"[W]hether a particular official has 'final policymaking authority' is a question of *state law.*" *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV15-07895 JAK (MRWx) | Date | May 2, 2017 |
|---|---|---|---|
| Title | J.V., et al. v. Pomona Unified School District, et al. | | |

(emphasis omitted)). "[T]he identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Id.* (emphasis in original). "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue. . . . " *Id.* (emphasis omitted).

It is not clear from the laws and policies cited by Plaintiffs whether the Superintendent has final policymaking authority on matters of special education. But, even if such a showing were made, in light of the dismissal of the § 1983 claims against Soto, Garcia, Krivan, Murillo, Amancio, Green, Yales and Shields, the only such claims that remain are against Petro. Those claims are supported by evidence that Petro pushed B.K. against the wall and slapped him. No evidence has been provided of any indication that Martinez knew of or had supervisory power over these alleged abuses. Nor is there an indication that District policy condoned such abuses. To the extent that Plaintiffs' claims survive summary judgment based on inadequate district-wide policies, those claims are statutory and not constitutional. The SAC seeks relief under § 1983 only for violations of the Fourth Amendment.

**V.   <u>Conclusion</u>**

For the reasons stated in this Order, the Motion to Exclude Ott is **DENIED**. The Motion to Exclude Travers is **GRANTED**. The Motion for Partial Summary Judgment is **GRANTED IN PART**. Summary judgment is denied as to Plaintiffs' claims under Section 504 and Title II and granted as to Plaintiffs' 1983 claims against Soto, Garcia, Krivan, Murillo, Amancio, Green, Yales, Shields and Martinez.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak